Filed 7/18/16

# IN THE SUPREME COURT OF CALIFORNIA

|                                   |   |                         |
|-----------------------------------|---|-------------------------|
| THE PEOPLE,                       | ) |                         |
|                                   | ) |                         |
| Plaintiff and Respondent,         | ) |                         |
|                                   | ) | S102166                 |
| v.                                | ) |                         |
|                                   | ) |                         |
| RICHARD NATHAN SIMON,             | ) |                         |
|                                   | ) | Riverside County        |
| Defendant and Appellant.          | ) | Super. Ct. No. CR-68928 |
| _____ | ) |                         |

In November 1999, a Riverside County jury found defendant Richard Nathan Simon guilty of the first degree murders of Vincent Anes and Sherry Magpali (Pen. Code,[1] § 187, subd. (a)), the second degree murder of Michael Sterling with the personal use of a firearm (*ibid.*), the rape of Magpali (§ 261, subd. (a)(2)), and the kidnapping of Magpali (§ 207, subd. (a)). The jury further found true the special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)), that Simon committed Anes's murder while engaged in the commission of a robbery (former § 190.2, subd. (a)(17)(i), now § 190.2, subd. (a)(17)(A)), and that Simon committed Magpali's murder while engaged in the commission of a robbery, kidnapping, and rape (*id.*, subd. (a)(17)(i)-(iii), now subd. (a)(17)(A)-(C)).

---

[1] Unless otherwise noted, all subsequent statutory references are to the Penal Code.

The jury was unable to reach a decision at the first penalty trial, so the court declared a mistrial. The court then empaneled a new jury, which fixed the penalty as death after a second penalty trial.[2] The trial court automatically reviewed the verdict (§ 190.4, subd. (e)), declined to modify it, and sentenced Simon to death.

This appeal is automatic. (§ 1239, subd. (b).) For the reasons that follow, we affirm the judgment in its entirety.

## I. BACKGROUND

### A. Guilt Phase

#### 1. Prosecution Evidence

##### a. The Killings of Vincent Anes and Sherry Magpali

On the evening of December 2, 1995, Vincent Anes drove his girlfriend Sherry Magpali and their friends Jose and Eugene Menor to a party in Moreno Valley. About two hours later, the four left the party, went bowling, and visited nearby Taco Bell and Claim Jumper restaurants. Not long after midnight, Anes dropped Magpali off near her house and drove the Menor brothers home. Jose then observed Anes make a U-turn and travel back toward Magpali's residence.

Around 1:00 a.m., Kenneth Riomales, Jason and John Marianas, and Noah Maling drove by Pedrorena Park and saw Anes's car in the parking lot. Assuming Anes was with Magpali, they did not stop. No more than half an hour later, the group returned, checked on the car, and saw a bullet-ridden naked body in the rear seat. Although the body's face was covered, they suspected it was Anes. Without immediately calling 911, the group drove to Anes's nearby house and asked Anes's mother if her son was home. When Anes's mother confirmed that he was

---

**2** Unless otherwise noted, the "penalty phase" refers to this second penalty trial.

2

not, Riomales called 911 and the group returned to Pedrorena Park with Anes's mother, brother, and grandfather. Officers met the group within minutes and confirmed that Anes was deceased.

The investigating officers observed that Anes's body was missing a ring and necklace that he had been wearing earlier that evening. Also missing was a large speaker from the car's trunk. From the vehicle, investigators collected eight 9-millimeter shell casings and three 9-millimeter projectiles. They also found a jacket holding some of Magpali's possessions, including a camera with photographs of the couple from that evening's party.

Nearby, officers found Anes's underwear and T-shirt on a basketball court. The underwear had been cut along the edges of the waist and legs, and the crotch had been cut or ripped out. Officers also found torn pieces of Magpali's undergarments as well as Anes's pants, belt, and sock on the roof of a restroom. Magpali's bra was on the ground near that restroom. Officers recovered 29 latent fingerprints from the vehicle and six from the restroom door, but none matched any prints within the automated statewide fingerprint identification system.

Later that morning, officers found Magpali's body several miles away on the side of Interstate 215 in Sun City, clothed only in jeans and a blouse. Rings and a necklace she had been wearing that night were missing. Investigators noted blood under her head, and bloodstains on her right hand and jeans. They recovered two 9-millimeter shell casings near Magpali's body and two 9-millimeter projectiles in the dirt beneath her head. Investigators also applied "tape lifts" to collect trace evidence that may have adhered to Magpali's body and clothing.

Evidence from the victims' bodies was later collected at the coroner's office. Plant material was collected from Anes's penis and thigh, but there was no indication of sexual assault. Anes's autopsy revealed eight gunshot wounds, all

3

received within a span of seconds to a minute or two, and from a gun fired between three and 18 inches away. In total, five 9-millimeter projectiles were removed from Anes's body. The other three had been found in the vehicle. Magpali's autopsy revealed two gunshot wounds to the head, with holes consistent with a medium caliber weapon fired from at least 18 to 24 inches away. Inconclusive evidence indicated that a third projectile may have grazed Magpali's face. Toxicology screenings of Anes and Magpali came back negative for alcohol and drugs.

Trace evidence collected from Magpali's body included fibers, fingernail clippings, swabs from her hands and vagina, and brushings from the hair on her head and pubic region. Brushings from her pubic hair, as well as the vaginal swab, revealed the presence of sperm. Her jeans and shirt showed possible semen stains, in addition to plant material and bloodstains. And although no signs of vaginal trauma were detected, Magpali's legs had fingertip bruising and scratches consistent with being held forcefully. When police later obtained a DNA profile from Simon's blood sample, it matched the DNA profile exhibited in the sperm fraction present on the vaginal swab taken from Magpali's body and in the stains from the crotch area of her jeans. Simon was the only possible source of the DNA samples obtained from those sperm fractions.

Other trace evidence on Magpali's body included red fibers on her jeans and on the back of her right leg. These fibers were later determined to be consistent with carpet fibers from a 1981 Dodge Colt, which was owned at the time by Curtis Williams,[3] an associate of Simon's. Upon further inspection, this

---

[3] Williams was arrested in connection with the murders of Anes and Magpali on October 6, 1999. He was tried and convicted in separate proceedings and is not involved in this appeal.

vehicle contained two bullet-sized holes, one at the front edge of the glove box and one behind it, which tested "weakly positive" for lead.  While possible that one bullet created both holes, no projectile was found in Williams's car.

Preliminary examination of the recovered projectiles and shell casings from both crime scenes showed that all projectiles were probably fired from the same gun.  The cartridge casings, in particular, exhibited a distinctive impression left by the gun's firing pin, which was entered into the Federal Bureau of Investigation's Drugfire system.

On January 18, 1996 — less than seven weeks after the bodies of Anes and Magpali had been discovered — Simon was pulled over for a traffic stop with two passengers in the car.  All occupants were arrested, the car was impounded, and an inventory search revealed a nine-millimeter handgun containing 17 rounds under the front passenger's seat.  Mamie Meeks — Simon's front seat passenger — testified that earlier that day Simon had driven to a nearby home to pick up a gun he had said he needed for protection from "some of the gang bangers or something in San Bernardino he didn't get along with."  Meeks explained that upon being pulled over, Simon gave the gun to Meeks and told her to put it under the seat.  Simon called Meeks from jail the next day, asking her to claim ownership of the weapon.  When she refused, Simon became angry and told Meeks that he was going to "fuck her up."  This threat prompted Meeks's relocation to Nevada for several months.  Simon was eventually released from custody.

On May 7, 1996, cartridge casings from the gun found in Simon's possession were test fired.  They matched the impression previously entered into the Drugfire system.  Further examination revealed that all 10 cartridge casings recovered from the Anes and Magpali crime scenes had been fired from that gun.

### b. The Killing of Michael Sterling

The night of May 25, 1996, officers responding to a call arrived at an apartment complex in Moreno Valley. The officers found Vernice Haynes in a field across from the complex's parking lot, kneeling next to Michael Sterling, who had been shot. Sterling was conscious at the time, but he died of a single gunshot wound to the chest shortly after paramedics transported him to Riverside Hospital.

Haynes — Sterling's then-fiancée — testified that on the night of the incident, she and Sterling had been visiting an apartment where Davinna Gentry, Sterling's cousin, lived with Williams, Gentry's boyfriend. Around 8:00 p.m., Simon, joined by Jamal and Raheen Brown, knocked on the door. When Gentry opened it, Simon asked if "Droopy" (i.e., Williams) was home. Gentry turned to look at Williams, stepping away from the door, at which point Simon entered and shook Williams's hand.

Williams introduced Simon to Sterling, the two shook hands, and Simon asked Sterling where he was from. After Sterling identified himself as a member of the Inland Empire (IE) gang, Simon — who claimed membership in a rival gang — became angry, cursing at Sterling. Sterling stood up and lifted his shirt, showing that he was unarmed, and told Simon that he had just been released from prison and was "trying to be cool." According to both Gentry and Haynes, Simon then told Jamal and Raheen to go get his gun, but they refused. At trial, Jamal denied that Simon had made this request.

Williams attempted to usher Simon outside to talk. Simon responded by swinging his fist at Williams and asking why he was hanging out with "IE." Gentry asked Simon to leave, as she did not want fighting in her home. Around this time, Simon asked Williams if he could use the bathroom, and during his absence Gentry told Williams to get Simon out of the house.

6

Testimony conflicted on the events that followed. Gentry testified that after Simon used the bathroom, he appeared to have calmed down, apologized to Sterling and Williams, shook Sterling's hand, hugged Sterling, and left the apartment with Williams in tow. According to Haynes, Simon cooled down, apologized, and hugged Sterling before going to the bathroom. Haynes testified further that during Simon's absence, she told Sterling that she wanted to leave because she was afraid Simon was going to shoot them. But Sterling, worried what might happen to Williams, preferred to stay. Haynes also said that when Simon exited the bathroom, he apologized again to Sterling, but struck Williams in the face with his elbow and yelled at Williams for having Sterling in the house. At some point, though, Simon exited the house, and Williams followed.

Testimony again conflicted on the events that transpired after Simon and Williams went outside. According to Haynes, she and Gentry urged Sterling to stay inside, but he insisted on leaving to check on Williams. Haynes testified that she asked Gentry if there was a back door so that she could go get Sterling's brothers, but Gentry told her not to leave the house. And as she and Gentry were arguing, Haynes said she heard three shots.[4] Haynes then testified that Williams returned within moments; he appeared to have been in a fight. She ran outside, observed Simon and one of his friends running toward Simon's car, saw Sterling staggering in the field across the street, and ran toward Sterling. Sterling fell to the ground and told Haynes that he would be going back to jail.

When interviewed by police, Gentry's version of the events was consistent with Haynes's testimony in that Gentry said she was inside the apartment when she heard gunfire. At trial, however, Gentry claimed that the transcript of her

---

[4] After the incident, Haynes told officers she had heard four shots.

7

taped interview with police was incorrect. Gentry testified instead that after Sterling exited the house, Haynes became upset and ran into the bathroom. Gentry claimed she then ran out the back door and looked over the gate to see what was happening. Gentry said that she could only see shadows, but could tell that Sterling was leaning on Simon's car, and heard Simon tell Sterling to get off the vehicle. When Sterling stood up, she heard two shots together, and a third three to four minutes later.

Jamal Brown also testified at trial, acknowledging that he and his brother Raheen accompanied Simon to Gentry's apartment that evening. Jamal recalled arguments both inside and outside of the apartment, but he testified that Simon never told him to go get a gun. Jamal testified further that he did not remember how many shots were fired and was not paying attention to what was going on immediately before the shooting. When an officer interviewed Jamal on May 31, 1996, however, Jamal said he had heard two shots. During that interview, Jamal also said that Simon had shown him a gun the day of the incident. And although Jamal claimed not to have witnessed the events immediately preceding the shooting, he told the officer that Simon "totally shot [Sterling] cold blooded."

When they arrived at the scene, officers found a spent shell casing under a stairway across from where Sterling fell. Sterling's autopsy showed that he was killed by a single gunshot wound to the torso from a .22-caliber bullet traveling slightly downward, slightly forward, and from about two feet away. Sterling's toxicology screening was positive for marijuana and showed a blood-alcohol content of 0.10 percent at the time of death.

On May 26, 1996, officers arrested Simon and searched his home. The search was conducted in accordance with a condition of Simon's probation for a 1993 attempted robbery conviction. The condition required that Simon "[s]ubmit [his] person and property under [his] control to search or seizure at any time of the

8

day or night . . . with or without a warrant, or probable cause." During the search, officers found a .22-caliber handgun under Simon's mattress, a box of CCI brand ammunition, and a clip loaded with several brands of bullets. Investigators later determined that the shell casing recovered from the Sterling crime scene was fired by this gun, and the projectile from Sterling's body could have been fired by this gun.

### 2. *Defense Evidence*

The defense theory of the Anes/Magpali murders was that Williams alone was responsible for killing the two teens. In support of this theory, the defense presented evidence that Williams would have had access to the murder weapon during the relevant time period. Defense witnesses testified that on January 18, 1996, when Simon was stopped for the traffic violation, he had gone with Meeks to a residence on Fay Avenue to pick up the gun. Witnesses testified further that Williams regularly visited a friend at that house.

As to the Sterling homicide, the defense argued that the offense amounted to less than first degree murder based in part on character evidence suggesting Sterling had a propensity for violence. Haynes, Sterling's fiancée at the time, testified that Sterling had been in prison for assaulting another man, and that he had been in jail on other occasions.

### B. Penalty Phase

At the penalty phase, the prosecution relied on the circumstances of the crimes and Simon's previous misconduct as evidence in aggravation supporting imposition of the death penalty. The prosecution presented testimony relating to the circumstances of the convicted offenses, as well as victim impact evidence on behalf of Magpali, Anes, and Sterling. As to previous misconduct, the prosecution introduced evidence that jail personnel had found shanks in Simon's cell on two

9

occasions.  The prosecution also introduced evidence of a letter, purportedly written by Simon while in jail, to his cousin Terri Richardson.  The letter, which referenced committing possible acts of violence against other inmates, was admitted to show Simon's motive or intent for possessing a shank on the first occasion.  The letter stated, for example, "I'll hurt one of these fools . . . .  I'm tired of these punk ass fools in here . . . ."  It continued, "I'm not going to take this shit too much longer. . . .  I'm going to lay one of they ass out.  I'll beat the shit out of one of these fools."  The letter was signed, "Still you cuz, Nate."

The defense presented evidence in mitigation.  In making the case for mitigation, the defense focused on Simon's psychological background, including testimony from relatives about Simon's childhood and expert testimony discussing organic brain damage.  Simon's mother, who eventually became a police officer, testified that she had been in several abusive relationships during Simon's formative years.  One of those relationships was with her patrol sergeant, who became physically abusive toward both her and Simon.  On one occasion, this man punched Simon for teasing the man's youngest son.  On another, the man tied Simon's hand to a door with a belt and beat him severely.  When Simon was in his late teens, he was knocked unconscious during a fight at a park in Compton.  About a year later, Simon moved from California to Michigan to live with relatives.  While there, he suffered a gunshot wound to the head, causing him to lose sight in his left eye.  After being hospitalized for his injuries, Simon returned to California.  His cousin Richardson testified that Simon seemed different when he came back from Michigan.  But Simon was supportive of Richardson during her pregnancy.  Another of Simon's female relatives, his half sister, testified that she considered Simon a positive role model who had discouraged her from engaging in criminal behavior.

10

The defense also offered testimony from two medical experts. The first, Dr. David Fukuda, treated Simon during the time he was incarcerated pending trial. Dr. Fukuda prescribed medication to control Simon's seizures and ordered skull X-rays and a computerized axial tomography (CAT) scan, which revealed bullet fragments lodged in Simon's right nasal bone and left eye socket. The CAT scan also revealed encephalomalacia of the right frontal lobe with deformity of the overlying cranium consistent with Simon's previous surgery to treat the gunshot wound he sustained in this area. The second expert, neurologist Dr. Kenneth Nudleman, examined Simon prior to trial. Dr. Nudleman reviewed Simon's medical records and ordered additional neurological testing. From these sources, Dr. Nudleman concluded that Simon suffered from significant organic brain damage primarily to the right frontal lobe and, to a lesser extent, the left frontal lobe. He found roughly 20-25 percent of Simon's right frontal lobe was missing. This part of the brain, Dr. Nudleman explained, is involved with impulse function and anger control.

During rebuttal, the prosecution introduced an undated and unaddressed letter that had been enclosed in the Richardson letter and was purportedly directed toward Simon's wife, Keisia. The letter, introduced to rebut evidence of Simon's good character, contained threatening and explicit language. It read, for instance: "If I can't get you, I'm getting the closest thing to you, bitch. . . . [¶] I'm going to get you, bitch. . . . I'm the one to be scared of. . . . [¶] I'm already a dead man walking, . . . so can't shit you say or do hurt me. But I can do a whole lot to hurt you. . . . [¶] You are now considered road kill, bitch, and if you run from it, your best friend takes your place." The letter was signed, "Until doomsday, yours that is; [¶] Nate, (rides again)."

11

## II. DISCUSSION

### A. Issue Affecting Both Phases

#### 1. Stun Belt

Simon claims the trial court erred by requiring him to wear a remote-controlled stun belt as a security measure during the guilt and penalty phases.[5] We disagree.

#### a. Background

On September 13, 1999, the first day of jury selection, defense counsel requested that "no chains, shackles, cuffs [or] anything of that sort be worn by the defendant during the course of the trial." Defense counsel stated that he had been told Simon was wearing a Remote Electronically Activated Control Technology (REACT) stun belt that day, an arrangement defense counsel opposed unless the court could provide adequate justification. Defense counsel also complained that the belt was placed in such a manner — near Simon's left hip — that some jurors might be able to notice it.

The trial court granted the motion that Simon be unshackled. But the court, relying on a series of incidents described by the bailiff, denied Simon's request to have the stun belt removed. At the court's behest, the bailiff detailed the following incidents on the record: in June 1996, Simon had a fight with another inmate; less than a year later, in April 1997, jail personnel found a shank in Simon's cell; in July 1998, Simon refused to obey a deputy's order, and jail personnel found excess food in his cell; in September 1998, Simon refused to return to his cell during a lockdown, and jail personnel found two plastic shanks in

---

[5]    A stun belt is a device worn around the waist that delivers an incapacitating electric shock when activated by a court security officer. (See *People v. Mar* (2002) 28 Cal.4th 1201, 1204 (*Mar*).)

Simon's cell; in August 1999, jail personnel found feces stored in a container in Simon's cell, along with cleaning products; and that same month, Simon threatened a new deputy.

In denying Simon's motion, the trial court expressed particular concern about the shanks and incidents of fighting. The court also noted that it had inquired into why the feces and cleaning supplies were significant and learned from the bailiff, as well as from another deputy who was present during their discussion, that these items are commonly used in making explosives.

Defense counsel next indicated that Simon was uncomfortable because the position of the stun belt prevented him from leaning back in his chair. Defense counsel also requested that the belt be placed on Simon's right side to make it more difficult for the jury to notice its presence. The trial court asked whether the belt could be worn on either side, to which the bailiff responded that the belt could only be placed on the left side. The court then asked if the inability to lean back is a typical problem with the belt, and the bailiff explained that an extra cushion positioned on the right side usually solved this problem.

Defense counsel interjected to raise another concern: Simon had a prior injury to his left hip area that was causing him discomfort. The cushion, defense counsel explained, did not improve Simon's ability to lean back, and he was worried Simon would appear uncomfortable in front of the jury. Defense counsel also argued that Simon should not have to wear the stun belt at all because there had been no indication that Simon was a flight risk, and because searching him prior to his entering the courtroom would alleviate any concerns about his bringing in weapons.

The trial court declined to change its positon. The court explained that its primary concern was not necessarily that Simon would bring a shank into the courtroom or attempt to escape. Rather, the concern was that the shanks, fights,

13

and bomb-making materials indicated to the court that Simon was a danger to others. The court noted further: "When we bring 75 good citizens into the courtroom, I think we need to do everything we can to make sure that they are protected, as well as our own staff and counsel. And I think that . . . some kind of restraint is appropriate." The court also prepared a minute order, dated September 13, 1999, which read: "Oral Motion By DEFENSE regarding NO RESTRAINTS ON DEFT DURING TRIAL is called for hearing. [¶] Motion Granted. [¶] Defendant to remain unshackled during trial. [¶] Motion denied as to React Belt. Defendant to wear React Belt during trial."

Simon renewed his objection to wearing the stun belt on July 16, 2001, at the start of the penalty phase. Defense counsel noted the absence of any incidents during the three and a half month trial of the guilt phase, and during the year and a half since a mistrial had been declared at the first penalty trial. Defense counsel acknowledged that the stun belt was "less obtrusive and noticeable than shackles or something of that sort," but he added that the stun belt was still a "fairly obtrusive item" and could be seen if Simon were not wearing a jacket.

The trial court solicited information from a sheriff's deputy, who reminded the court of incidents with the shanks and the fight involving another inmate. The deputy also mentioned that Simon had claimed to be a member of the Crips gang and had been verbally aggressive toward deputies on several occasions since 1998 and as late as 2001. The deputy noted further that Simon had written a letter in 1997 containing racial slurs and mentioning a possible attempt to assault a Hispanic inmate. Finally, the deputy opined that because Simon had already been convicted, he had nothing to lose. Simon was therefore considered "a very high security risk" who was being housed accordingly.

Defense counsel argued that neither the charges brought against Simon nor the nature of his crimes could alone justify requiring him to wear the stun belt.

14

Further, defense counsel objected to the vagueness of the deputy's references to Simon's alleged verbal aggression toward his jailers. He questioned the reliability of the information and noted that the deputy was not under oath. The deputy interjected at that point, explaining that an incident had happened that morning.

The trial court then asked for input from the prosecutor, who argued that Simon had exhibited violent tendencies by taking the time to manufacture weapons in his cell, and that the court should ensure the safety of the courtroom by requiring Simon to wear the stun belt. The prosecutor also noted the possibility of using another type of stun belt that is worn on the leg rather than the waist. A deputy explained that this device is called a Band-It, but it was being used at another facility so it was not available that day. The deputies would need two days' lead time in order to obtain it.

After reflecting on the views expressed by counsel and the relevant information, the trial court ruled that Simon should continue to wear the stun belt for the penalty phase. The court agreed with defense counsel that verbal aggressiveness, the threats in the letter, and the nature of the charges and possible punishment did not warrant use of the stun belt. The court also agreed that Simon was unlikely to bring a weapon to court. Nonetheless, Simon's previous possession of shanks demonstrated a potential willingness to commit violence. Observing that only one or two armed deputies would be present, the court reiterated its concern for the safety of the more than 90 people that would be in the courtroom. The court also stated it would "certainly direct the deputies at this time to put [the stun belt] on in such a way that it is as unobtrusive as possible." In this vein, the court asked again whether the belt could be put on Simon's right side. Although the deputies had previously told the court this was not possible, they now informed the court that the belt could in fact be placed on Simon's right side for the penalty phase. The court also asked the deputies to look into the

15

possibility of obtaining the Band-It, but defense counsel did not press the matter further.

### b. Legal Standard

A trial court has broad power to maintain courtroom security and orderly proceedings, and its decisions on these matters are reviewed for abuse of discretion. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 389 (*Bryant, Smith and Wheeler*).) That discretion, however, must yield to principles of due process. (*Ibid.*) To that end, we have held that physical restraints of any kind are inappropriate in the courtroom while the jury is present, unless there is a manifest need for such restraints. (*People v. Duran* (1976) 16 Cal.3d 282, 290-291 (*Duran*).) This "manifest need" standard applies equally to use of a stun belt. (*Mar*, *supra*, 28 Cal.4th at pp. 1218-1220.) In determining whether there is a manifest need to restrain the defendant, courts consider several factors, including evidence that the defendant poses a safety or flight risk or is likely to disrupt the proceedings. (*Bryant, Smith and Wheeler*, at p. 389.) The use of physical restraints in the absence of a record showing of violence, a threat of violence, or other nonconforming conduct is an abuse of discretion. (*Duran*, at p. 291.)

No formal hearing is required. But when the use of restraints is based on conduct of the defendant that occurred outside the presence of the trial court, sufficient evidence of such conduct must be presented on the record so that the court may make its own determination of the nature and seriousness of the conduct and whether there is a manifest need for such restraints. (*Mar*, *supra*, 28 Cal.4th at p. 1221.) The court may not, we have emphasized, merely rely on the judgment of law enforcement or court security officers or the unsubstantiated comments of others. (*Ibid.*) The court's determination must be based on facts, not rumor or innuendo. (*People v. Cox* (1991) 53 Cal.3d 618, 652.) And even when the record

16

establishes a manifest need for restraints, the restraint imposed must be the least obtrusive or restrictive one that would be effective under the circumstances. (*Duran*, *supra*, 16 Cal.3d at p. 291; *Mar*, at p. 1226.)

### c. Analysis

Simon argues first that the trial court abused its discretion by applying a lower standard at the guilt phase to reject his request to have the stun belt removed. According to Simon, the court improperly applied something akin to a "good cause" standard — rather than the required manifest need standard. In support of his contention, Simon points to the fact that the court, after sustaining Simon's objection to being shackled, appears to have treated the stun belt issue as a separate matter. Simon also points to the trial court's statement that use of the stun belt was "appropriate" (instead of "necessary") as suggesting that it applied something lower than the manifest need standard prescribed by *Duran* and *Mar*.

But Simon's guilt phase and penalty phase trials predated *Mar*. In that case, we held for the first time that the record must demonstrate a manifest need — rather than mere good cause — for imposition of a stun belt. And even if the trial court's use of the word "appropriate," rather than "necessary," may suggest it applied a lower standard, the record as a whole establishes that the manifest need standard was met. (See *People v. Mayfield* (1993) 5 Cal.4th 142, 196 ["The record of the hearing as a whole persuades us, however, that even though the court, in isolated instances, misstated the applicable standard, it nevertheless applied the proper concept"].)

The record shows that, at the guilt phase, the trial court based its decision on Simon's violent behavior in custody and his potential danger to others in the courtroom. In particular, the court's decision was based on Simon's fight with another inmate; the discovery, on two different occasions, of shanks in Simon's

17

cell; the discovery of feces and cleaning products, which Simon had stored in a container for possible use as an explosive; and Simon's threat against a corrections deputy. The court stated on the record that these incidents showed that Simon was a potential danger to jurors, court staff, and counsel. Likewise, at the penalty phase, the court relied on Simon's previous possession of shanks as evidence of his potential readiness to commit violence.

The trial court's findings and analysis were sufficient to show a manifest need for the stun belt. As we have held previously, a defendant's disruptive behavior while in jail, including possession of shanks or explosives, justifies the imposition of restraints. (See, e.g., *People v. Wallace* (2008) 44 Cal.4th 1032, 1050 [evidence of fighting with inmates and possession of illegal razors]; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1032 [defendant attacked another inmate and threatened to kill deputies]; *People v. Combs* (2004) 34 Cal.4th 821, 838 [defendant possessed two shanks in jail and threatened jail deputies]; *People v. Alvarez* (1996) 14 Cal.4th 155, 190-192 [fights with inmates, threatening deputies, and possession of weapons and an explosive device].)

In addition, the record shows the trial court was "aware of its obligation [under *Duran*] to make its own determination on the need for restraints, and not simply defer to the wishes of the prosecutor or courtroom security personnel." (*Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 391.) The court explained that it needed to state on the record the reasons justifying resort to the stun belt and identified the specific incidents supporting use of that restraint. The court further demonstrated an understanding of its duty under the *Duran* line of cases by noting at the start of the penalty phase that the mere fact of Simon's conviction and potential sentence could not justify imposition of the stun belt. (See *Duran*, *supra*, 16 Cal.3d at p. 293 ["we cannot condone physical restraint of defendants simply because they are prisoners already incarcerated on other charges or convictions"];

18

see also *People v. Hawkins* (1995) 10 Cal.4th 920, 944 ["We agree with defendant that his record of violence, or the fact that he is a capital defendant, cannot alone justify his shackling"].)  Instead, the court relied on Simon's history of possessing shanks, a circumstance we have held sufficient to show a manifest need for restraints.  (See *People v. Combs*, *supra*, 34 Cal.4th at p. 838.)

Simon contends that the incidents of violence supporting the trial court's decision were not described in sufficient detail because the bailiff had no personal knowledge of the events.  This argument is unavailing.  We have found that a trial court can base its decision to restrain a defendant on reliable facts provided by law enforcement or counsel.  (See, e.g., *People v. Wallace*, *supra*, 44 Cal.4th at pp. 1049-1050 [upholding trial court's imposition of restraints where deputy represented that defendant had 16 rules violations while in jail]; *People v. Medina* (1995) 11 Cal.4th 694, 731 [prosecutor's representations of facts, made without objection or rebuttal by defendant, properly supported trial court's ruling to impose restraints].)  Unlike in *People v. Cox*, *supra*, 53 Cal.3d at page 651, where the trial court's decision was based on " 'rumors floating through the jail' " about an escape attempt, the court here grounded its decision on incidents that had already occurred and for which the bailiff provided specific dates.  The court also explained that it had inquired further into the significance of the feces and cleaning supplies, learning that these items could be used in tandem to create explosives.  Moreover, as in *People v. Medina*, *supra*, 11 Cal.4th at page 731, Simon did not dispute his possession of the shanks and bomb-making components, or his altercation with another inmate.  At the penalty phase, defense counsel did object on vagueness grounds to the deputy's references to Simon's verbal aggressiveness, but the court did not base its decision thereon.  To the contrary, the court explicitly stated that verbal aggression would not warrant imposing the

19

stun belt on Simon. The court based its rulings at both the guilt and penalty phases on uncontested facts related by the bailiff and sheriff's deputies.

Simon argues further that the trial court abused its discretion because it did not consider whether the stun belt was the least restrictive or obtrusive restraint under the circumstances. Underlying Simon's argument is his claim that the trial court failed to consider the potential psychological consequences of his wearing a stun belt and the physical effects from electric shock on individuals with certain medical conditions — considerations we discussed extensively in *Mar*. (See *Mar*, *supra*, 28 Cal.4th at pp. 1225-1230.) But we expressly stated that our discussion of these factors was included as guidance for "*future* trials." (*Id.* at p. 1225, italics added.) Because the proceedings below were held prior to our decision in *Mar*, the trial court was "not required to foresee and discuss each of the concerns detailed in that opinion." (*People v. Lomax* (2010) 49 Cal.4th 530, 562.) The trial court, therefore, cannot be said to have abused its discretion. (See *Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 391.)

Simon's broader argument also founders. The record shows the trial court was deliberate in its choice of restraint, ruling that although the stun belt was appropriate, shackles were not. And defense counsel later conceded that the stun belt was less obtrusive than traditional shackles. The court also explained that it was not necessarily concerned Simon would bring in weapons or escape; rather, its concern was that Simon's tendency toward violence posed an undue risk to those in attendance. Thus, simply searching Simon before he entered the courtroom, as defense counsel had recommended, was not enough to protect the public in the court's view.

The record further indicates the trial court attempted to make the device as comfortable and unobtrusive as possible. After Simon complained before the guilt phase that the stun belt was causing discomfort to his left hip area, the court

20

allowed an extra cushion for Simon and inquired about having the belt repositioned. Although Simon indicated that the pillow did not ease his discomfort, when defense counsel objected to the belt at the start of the penalty phase, he did not argue that Simon had *actually* been uncomfortable during the guilt phase — defense counsel noted only that a pillow had to be provided to alleviate Simon's discomfort. The court also directed the deputies to place the belt on Simon "in such a way that it is as unobtrusive as possible." The court then asked them to look into obtaining the Band-It — a stun belt worn on the leg, rather than the waist — for the remainder of the penalty phase. This device was not available, however, because it was being used at another facility. But the court did ask the deputies to investigate obtaining the device, and Simon never raised the issue again. Contrary to Simon's assertions, the court considered less restrictive security measures and implemented available procedures to address his discomfort and mitigate the stun belt's obtrusiveness.

We therefore hold that the trial court's decision to restrain Simon with the stun belt was not an abuse of discretion.

## B. Guilt Phase Issues

### 1. Warrantless Blood Draw

Simon argues that two blood samples taken following his arrest for the Sterling homicide were illegally obtained. As a result, Simon contends, the DNA evidence extracted from the second sample — evidence that connected Simon to the Anes and Magpali murders — ought to have been suppressed. We find any error harmless.

### a. Background

Simon was arrested in connection with the Sterling homicide between 3:30 and 4:00 a.m. on May 26, 1996. A few hours after Simon had been arrested and

21

transported to the local police station, at approximately 7:00 a.m., investigating officers arranged for a nurse to draw a sample of Simon's blood. Several hours after the first blood draw, a nurse took a second blood sample. Hair and saliva samples were also taken. The second blood sample was used to create a DNA profile that was compared to DNA samples taken from the scene of the Anes and Magpali murders. The police did not obtain a warrant for either blood sample.

Simon moved to suppress all evidence involving the blood samples, including the results of DNA testing, on grounds that the samples had been obtained without a warrant and absent any exception to the warrant requirement. In opposing the motion, the prosecution explained that at the time the samples were taken, Simon was on probation for a 1993 attempted robbery conviction. According to the prosecution, then, the taking was authorized by a probation search condition — which the investigating officers knew of at the time — that required Simon to "[s]ubmit your person and property under your control to search or seizure at any time of the day or night . . . with or without a warrant, or probable cause." The prosecution argued in the alternative that the first blood sample, drawn within hours of Simon's arrest for the Sterling homicide, was needed to determine Simon's level of intoxication and state of mind at the time of the homicide, and that the dissipation of such evidence over time created an exigent circumstance that excused the warrant requirement. Finally, the prosecution maintained that Simon's DNA profile, which was derived from the second blood sample, would inevitably have been discovered given that the first sample had been obtained lawfully and police already had evidence linking Simon to the Anes/Magpali murders at the time of Simon's May 26 arrest.

Following a hearing, the trial court denied Simon's motion to suppress. In the court's view, the probation search term "does include the right to search the person, . . . including even the bodily fluids, hair, [and] various other samples that

22

might be taken." The court therefore concluded that the blood draws, which the parties later agreed had been conducted in a "legally and medically prescribed manner," were lawful. Simon contends that this ruling was erroneous and that admission of the DNA evidence derived from the warrantless blood draws violated his rights to be free of unreasonable searches and seizures under the federal and California constitutions.

### b. Legal Standard

A defendant may move to suppress evidence under section 1538.5 on grounds that a search without a warrant was unreasonable. A warrantless search is presumptively unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search. (*People v. Redd* (2010) 48 Cal.4th 691, 719.) In reviewing a trial court's ruling on a motion to suppress, we defer to the trial court's factual findings, express or implied, where supported by substantial evidence. (*Ibid.*) And in determining whether, on the facts so found, the search was reasonable for purposes of the Fourth Amendment to the United States Constitution, we exercise our independent judgment. (*Ibid.*)

### c. Analysis

We have not addressed whether a general probation search condition, such as the one to which Simon was subject, authorizes a warrantless, nonconsensual blood draw. (Cf. *People v. Jones* (2014) 231 Cal.App.4th 1257, 1266 [postrelease community supervision search condition, which provided that " '[t]he person, and his or her residence and possessions, shall be subject to search at any time of the day or night, with or without a warrant . . . ,' " encompassed warrantless blood draws].) And we need not do so here: even if the May 26 blood draws exceeded the scope of Simon's probation search condition, the trial court's decision not to

23

suppress the DNA evidence derived from those blood draws was harmless in this case.

At the time of Simon's arrest on May 26, 1996, investigators had significant evidence linking him to the murders of Anes and Magpali. Five months earlier — in January — Simon had been pulled over and found in possession of a nine-millimeter handgun. By May 7 — almost three weeks before Simon's arrest for the Sterling murder — investigators had determined that this particular gun was the source of the 10 cartridge casings found near the bodies of Anes and Magpali. In addition, the officers who ordered the blood draw knew that Simon had recently shot and killed another person (i.e., Sterling).

So when Simon's blood was drawn, he was in custody for the Sterling homicide, and the police had key evidence tying him to the murders of Anes and Magpali — namely, Simon had been found in possession of the murder weapon. Given this evidence, and the fact Simon was lawfully in custody for a separate homicide, the trial court would have, to a near certainty, ordered a subsequent blood sample be taken from Simon even if the initial samples had been drawn unlawfully. That new sample would have disclosed Simon's DNA profile — the very information used against him at trial. Any error in not suppressing the blood samples was therefore harmless. (See *People v. Siripongs* (1988) 45 Cal.3d 548, 569 [finding any error in not suppressing warrantless blood draw "harmless" because "even had the [trial] court ruled the blood sample unlawfully drawn, [probable cause existed so] it could have later ordered a new blood sample to be drawn"].)[6]

---

[6] Following oral argument in this case, the United States Supreme Court held that the search-incident-to-arrest doctrine does not justify law enforcement's failure to obtain a warrant before drawing the blood of someone lawfully arrested

*(footnote continued on next page)*

## 2. Severance

Simon argues that the trial court committed reversible error in denying his motion to sever the Anes/Magpali counts from the Sterling counts. We find no error.

### a. Background

Before the guilt phase, Simon moved to sever the Anes/Magpali charges (counts 1-5)[7] from the Sterling charges (counts 6-7),[8] and made several arguments for why joinder of the offenses would be "so prejudicial that it would deny [him] a fair trial." First, Simon argued that evidence from each incident was not cross-

---

*(footnote continued from previous page)*

on suspicion of drunk driving. (See *Birchfield v. North Dakota* (June 23, 2016, No. 14-1468) ___U.S.___ [2016 WL 3434398].) Warrantless blood draws, in other words, cannot be justified as a search incident to arrest. This holding does not change the result here because, we conclude, any error in not suppressing the blood samples was harmless. And we need not consider the extent, if any, to which a search incident to arrest differs from a probation search.

[7] Count 1 charged Simon with the murder of Anes. It also alleged that he used a firearm during the murder and that the murder was committed during the commission of a robbery. Anes's missing jewelry and speaker were the basis for the robbery allegation. Count 2 charged Simon with the murder of Magpali. It also alleged that he used a firearm during the murder and that the murder was committed during the commission of a robbery, kidnapping, and rape. Magpali's missing jewelry was the basis for the robbery allegation. Count 3 charged Simon with the rape of Magpali. It also alleged that he used a deadly weapon during the rape and that the rape was committed during the course of a kidnapping. Count 4 charged Simon with kidnapping Magpali. It also alleged that he used a firearm during the commission of the kidnapping. Count 5 charged Simon with possession of a firearm — on or about December 3, 1995 — after previously being convicted of attempted robbery.

[8] Count 6 charged Simon with the murder of Sterling. It also alleged that he used a firearm during the murder. Count 7 charged Simon with possession of a firearm — on or about May 25, 1996 — after previously being convicted of attempted robbery.

admissible because the events were unrelated. Second, he contended that evidence from both incidents was highly inflammatory. Simon noted that the Anes/Magpali incident involved the killing of two teenagers, one of whom was sexually assaulted, and the Sterling shooting appeared to be gang related. Third, Simon claimed that the evidence supporting the Sterling charges was relatively weak compared to the "strong" Anes/Magpali charges. And fourth, Simon argued that because the Sterling charges did not independently give rise to special circumstances warranting the death penalty, their joinder with the Anes/Magpali capital offenses would be highly prejudicial.

Following a hearing, the trial court denied Simon's motion to sever. The court offered the following explanation: "it does appear to me that there is some potential prejudice. However, I don't think that that prejudice outweighs the benefits. And so without saying more, I'm going to deny the motion."

### b. *Legal Standard*

Section 954, in relevant part, permits the joinder of "two or more different offenses of the same class of crimes or offenses." Joinder is ordinarily favored because it avoids the increased expenditures of funds and judicial resources that may result from separate trials. (See *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 (*Alcala*).) Joinder, therefore, "is the course of action preferred by the law." (*Ibid.*) Nonetheless, a trial court has discretion to sever properly joined charges in the interest of justice and for good cause. (§ 954; see *People v. Merriman* (2014) 60 Cal.4th 1, 37.)

Our review proceeds in two steps. First, we examine whether, in light of the information available at the time, the trial court abused its discretion in denying the severance motion prior to the guilt phase. (*People v. Mendoza* (2000) 24 Cal.4th 130, 161 (*Mendoza*).) Where, as here, the statutory requirements for

26

joinder are met,[9] a defendant must make a "clear showing of prejudice" to establish that the trial court abused its discretion in denying the motion. (*Id.* at p. 160.) A defendant seeking severance of properly joined charged offenses must make a stronger showing of potential prejudice than would be necessary to exclude evidence of other crimes in a severed trial. (*People v. Soper* (2009) 45 Cal.4th 759, 774.)

Second, even if the trial court's ruling was proper as a matter of state law, we will reverse the judgment if the defendant shows that joinder of the charges actually resulted in "gross unfairness" amounting to a denial of due process during the guilt phase. (*Mendoza*, *supra*, 24 Cal.4th at p. 162.)

### c. Analysis

#### i. Abuse of Discretion

We analyze severance questions by considering a case's specific facts. Whether a trial court abused its discretion in denying severance depends, thus, on the particular circumstances of each case. (*People v. Sandoval* (1992) 4 Cal.4th 155, 172.) The factors we consider are as follows: (1) whether the evidence relating to the various charges would be cross-admissible in separate trials, (2) whether any of the charges are unusually likely to inflame the jury against the defendant, (3) whether a weak case has been joined with a strong case or with another weak case, and (4) whether one of the charges is a capital offense or the joinder of the charges converts the matter into a capital case. (*People v. Elliott* (2012) 53 Cal.4th 535, 551.)

---

[9] Because murder, rape, robbery, and kidnapping are all assaultive crimes against the person, the Anes/Magpali incident and the Sterling incident both involved "offenses of the same class of crimes," thus satisfying the statutory requirements for joinder under section 954. (See *People v. Ramirez* (2006) 39 Cal.4th 398, 438-439; *People v. Rhoden* (1972) 6 Cal.3d 519, 524-525.)

We find that Simon has failed to establish a "clear showing" of potential prejudice under these factors. (*Mendoza*, *supra*, 24 Cal.4th at p. 160.) So he cannot show the trial court abused its discretion in denying his motion to sever.

### (a) Cross-admissibility

The prosecution conceded below that evidence for the separate incidents would not be cross-admissible in separate trials. Although cross-admissibility of evidence is often an independently sufficient condition justifying a trial court's denial of severance, it is not a necessary one. (See *Alcala*, *supra*, 43 Cal.4th at pp. 1221-1222, 1227.) In the absence of cross-admissibility, we turn to the remaining factors to assess whether the trial court abused its discretion. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 630-631 (*McKinnon*).)

### (b) Particularly Inflammatory Charges

Simon has not made a clear showing of potential prejudice under this factor. Comparing the two sets of charges, it appears plain that the Anes/Magpali murders were more likely to inflame the jury's passions. The victims, though no longer minors, were still teenagers. One of them was shot eight times, while the other was kidnapped from the scene and raped before being shot twice in the head. The facts of the gang-related Sterling murder, though far from innocuous, were unlikely to evoke the same emotions as the Anes/Magpali crimes.

Indeed, courts have recognized that sex crimes can be quite inflammatory, especially when they involve young victims. (See *Williams v. Superior Court* (1984) 36 Cal.3d 441, 452 (*Williams*) ["It is true that the present case does not involve the 'highly inflammatory' issue of sex crimes against children"], superseded by statute on another ground as stated in *Alcala*, *supra*, 43 Cal.4th at p. 1229, fn. 19.) In *Coleman v. Superior Court* (1981) 116 Cal.App.3d 129 (*Coleman*), a Court of Appeal case on which the parties rely, the defendant was

28

charged with sex crimes against an 11-year-old child and a 13-year old child.  The appellate court deemed it prejudicial to join these charges with a more serious murder charge, in part, because sexual crimes against children are "highly inflammatory" and might have "a very serious prejudicial effect upon the jury." (*Id.* at p. 139.)

But the animating concern underlying this factor is not merely whether evidence from one offense is repulsive, because repulsion alone does not necessarily engender undue prejudice.  (See *People v. Capistrano* (2014) 59 Cal.4th 830, 850 (*Capistrano*).)  Rather, the issue is " ' "whether strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case" on another crime.' " (*Ibid.*)  In *Capistrano*, for instance, we held that joinder of a brutal rape incident with a separate robbery did not unduly inflame the jury against the defendant.  (*Ibid.*)  We so held, in part, because the evidence of the separate robbery was far from weak — the defendant had admitted his participation in the robbery.  (*Ibid.*)  We therefore found no abuse of discretion because there was little risk that details of the rape would have bolstered an otherwise weak robbery charge.

*Coleman* illustrates the flip side of this point.  There, the Court of Appeal explained that the evidence supporting the more serious murder charge was relatively weak.  (See *Coleman*, *supra*, 116 Cal.App.3d at p. 138.)  Indeed, "the only evidence connecting defendant to the [murder] consists of the palm and thumb prints identified at the scene of the crime." (*Ibid.*)  "If a juror has a reasonable and appropriate doubt about the identity of the murderer," continued the court, "the juror may find it difficult to maintain that doubt in the face of direct evidence concerning repulsive crimes against minors committed by [defendant]." (*Ibid.*)  As a result, the Court of Appeal found the trial court had abused its discretion in denying the defendant's motion to sever.  (*Id.* at pp. 139-140.)

29

The situation here is similar to that in *Capistrano*. There is no reason to presume that the potentially inflammatory evidence of sex crimes from the Anes/Magpali incident was likely to prejudice Simon regarding the Sterling charges. Without question, the details of the Anes/Magpali incident are disturbing. But any effect this evidence would have had on the jury as a result of joinder was not unduly prejudicial given that the Sterling murder was no more serious an offense and was also supported by strong evidence. Unlike in *Coleman*, where joinder of inflammatory evidence was used to bolster a more serious — but weaker — case, the Anes/Magpali charges here independently gave rise to the death penalty by involving several special circumstance allegations. The Anes/Magpali murders, thus, cannot be characterized as the "lesser" crimes. (*Capistrano*, *supra*, 59 Cal.4th at p. 850.) Moreover, unlike in *Coleman*, where the evidence supporting the joined murder charge was relatively weak, here — for reasons discussed below — the Sterling homicide was supported by strong evidence.

There is little chance, likewise, that joinder of the Sterling matter prejudiced Simon with respect to the more inflammatory Anes/Magpali murders. True, we have recognized that gang evidence, even if relevant, can be "highly inflammatory." (*McKinnon*, *supra*, 52 Cal.4th at p. 655; see also *Williams*, *supra*, 36 Cal.3d at p. 453 [explaining that "evidence of gang membership . . . might indeed have a very prejudicial, if not inflammatory effect on the jury in a joint trial"].) But Simon does not explain why introducing evidence of a gang rivalry was sufficiently inflammatory that denial of severance constituted an abuse of discretion. And our case law is to the contrary.

In *McKinnon*, we held that the proffered gang evidence "was not unduly inflammatory." (*McKinnon*, *supra*, 52 Cal.4th at p. 631.) The defendant there was charged with two unrelated murders. In the first, the defendant walked up to a

30

stranger, placed a gun against that person's head, and shot him "for no apparent reason." (*Id.* at p. 620.) In the second, the defendant was engaged in an argument with a rival gang member before fatally shooting him. (*Ibid.*) In addition to evidence of gang name, membership, and rivalry, the prosecution submitted evidence that the defendant had shot the latter victim in retaliation for a separate gang-related murder. (*Id.* at pp. 624-625.)

On appeal, the defendant argued that joinder of the charges was prejudicial because gang evidence from the second incident was unduly inflammatory. (*McKinnon*, *supra*, 52 Cal.4th at p. 631.) We rejected that argument for three reasons: (1) the prosecution did not present any other evidence of gang violence aside from evidence that the murder was related to a prior gang-related killing, (2) any inflammatory effect of the gang evidence "paled in comparison" to the prejudicial impact of the "absolute senselessness" of the first incident, and (3) any inflammatory effect was not prejudicial because both cases were supported by strong evidence. (*Ibid.*)

So too here. In this case, as in *McKinnon*, the gang evidence from one incident (i.e., the Sterling murder) was not likely to alter the outcome of the other (i.e., the Anes/Magpali murders). In fact, there was even less gang evidence introduced here than in *McKinnon*. In that case, in addition to gang name, membership, and rivalry, evidence was introduced of a separate gang-related killing. (*McKinnon*, *supra*, 52 Cal.4th at p. 631.) The only gang evidence admitted here, in contrast, was limited testimony that Sterling's gang affiliation served as the impetus for Simon's rage. Furthermore, any inflammatory effect of the limited gang evidence here "paled in comparison" to the prejudicial effect of the murder, kidnapping, and rape charges in the Anes/Magpali incident. (*Ibid.*) This point is even clearer here than was the case in *McKinnon*, where the

31

prejudicial impact of the other crime was its "senselessness" (*ibid.*); here, the Anes/Magpali charges were both senseless and gruesome.

Unlike in *Williams*, moreover, where gang affiliation was used to implicate the defendant as the perpetrator, the gang evidence here was neither relied on nor was it necessary to link Simon to the strongly supported Anes/Magpali charges. (Cf. *Williams*, *supra*, 36 Cal.3d at p. 453.) Not only was there DNA evidence linking Simon to the Anes/Magpali murders, but Simon was also found in possession of the gun used to kill both victims. What made the gang evidence in *Williams* prejudicial — to wit, that a jury not otherwise convinced beyond a reasonable doubt of the defendant's involvement might use gang evidence to tip the scales and convict — is therefore not a concern in the present case. (See also *Capistrano*, *supra*, 59 Cal.4th at p. 853 [joinder of attempted murder charge did not deprive defendant of a fair trial where the only evidence of defendant's gang membership was the victim's testimony that "he believed defendant was a gang member"]; *People v. Sandoval*, *supra*, 4 Cal.4th at p. 173 [defendant failed to show requisite prejudice from joinder of other murder charges because any "inflammatory effect of defendant's gang membership as to the [other] case was neutralized by the fact that the victims were also gang members"].)

Only when a defendant has made a clear showing of potential prejudice may we find an abuse of discretion in this context. (See *Mendoza*, *supra*, 24 Cal.4th at p. 160.) There was none here. Simon has not shown the potentially inflammatory evidence from the Anes/Magpali incident would have altered the outcome of the Sterling charges, or vice versa.

### *(c)  Weak Case Joined to Strong Case*

Simon fails to establish a clear showing of potential prejudice under this factor because neither the Anes/Magpali incident nor the Sterling incident was a

32

weak case that needed joinder to bolster the likelihood of conviction. (See *People v. Balderas* (1985) 41 Cal.3d 144, 173-174.)

The core prejudice concern arising in connection with this issue is that jurors may aggregate evidence and convict on weak charges that might not merit conviction in separate trials. (*Williams*, *supra*, 36 Cal.3d at p. 453.) This concern is especially pronounced when evidence of a lesser but inflammatory incident might be used to bolster a weak prosecution case as to another incident. (*Capistrano*, *supra*, 59 Cal.4th at p. 850.) But even where evidence from one incident could be considered "inflammatory" as the term is understood in our case law (see *id.* at pp. 850-851), we will find no abuse of discretion if the evidence of guilt for each of the joined incidents is sufficiently compelling (see, e.g., *McKinnon*, *supra*, 52 Cal.4th at p. 631 ["This was not a matter in which a weak case was joined with a strong case, or with another weak case, thereby 'causing a spillover effect that might have unfairly altered the outcome of the trial.' [Citation.] Strong evidence supported both cases"]).

Such is the case here. Both the Anes/Magpali and Sterling charges were supported by strong evidence that would likely have merited conviction in separate trials. As to the Anes/Magpali incident, Simon conceded below that strong evidence supported these charges. The most damaging piece of evidence was that Simon's DNA profile matched the DNA profile of semen evidence collected from Magpali's body and clothing. Such evidence, we have held many times, indicates a strong case. (See, e.g., *People v. Scott* (2015) 61 Cal.4th 363, 396; *People v. Hartsch* (2010) 49 Cal.4th 472, 494; *People v. Geier* (2007) 41 Cal.4th 555, 576.) In addition, Simon was found in possession of the gun used to kill Anes and Magpali during a traffic stop less than seven weeks after the murders. Simon also exhibited a guilty mind following that stop in trying to coerce Meeks, Simon's front seat passenger, to claim ownership of the firearm.

As to the Sterling incident, Simon concedes there was "strong proof" he shot and killed Sterling. Nonetheless, Simon argued below that the Sterling charges were "weak" because evidence purportedly suggested the killing was justified as self-defense or could be mitigated to manslaughter by imperfect self-defense. Although the availability of defense theories may be relevant under this factor, there was very little to support the defenses Simon offered in this case. There was no meaningful evidence either that Sterling was armed or that he was the aggressor. Quite the opposite. There was substantial evidence in the record that Simon was the aggressor. In light of the admittedly strong proof that Simon shot and killed Sterling, combined with testimony that Simon was the aggressor, we find these charges supported by strong evidence. (See *People v. Johnson* (2015) 61 Cal.4th 734, 752 ["Although defendant presented an alibi defense to [one of the murders], a mere imbalance in the evidence between the joined crimes does not signal a risk that one charge will be prejudicially bolstered"].)

Simon's possession of the gun used to kill Anes and Magpali, DNA evidence linking Simon to Magpali's rape, and uncontroverted evidence that Simon — after having been the aggressor — shot Sterling indicate that both incidents were supported by strong evidence. Consequently, we find no clear showing of potential prejudice under this factor.

### *(d) Capital Offense*

Although joinder resulted in the Sterling murder being charged as a capital offense, Simon has not clearly shown potential prejudice under this factor because joining the charges neither converted the entire matter into a capital case nor bolstered the possibility of Simon receiving a death sentence.

Denials of severance involving capital charges generally require a "higher degree of scrutiny and care." (*Williams*, *supra*, 36 Cal.3d at p. 454.) Even greater

scrutiny is required, we have said, when the joinder of separate murder charges gives rise to the special circumstance allegation of multiple murder. (*Ibid.*) But nothing in our prior cases suggests that severance is required whenever capital charges are involved. (*People v. Balderas*, *supra*, 41 Cal.3d at p. 171.) Further, where one of two joined murder incidents would independently give rise to a capital charge, there is less risk of prejudice. (See *People v. Johnson*, *supra*, 61 Cal.4th at p. 752 [explaining that "joinder of the two killings did not convert the matter into a capital offense because [one of the killings] included two kidnapping and robbery special-circumstance allegations and thus made defendant eligible for the death penalty"]; *People v. Ruiz* (1988) 44 Cal.3d 589, 607 ["unlike the situation in *Williams*, joinder of the Tanya murder charge did not convert the case into a capital one, for the properly joined Pauline/Tony charges alone satisfied the multiple-murder special-circumstance statute"].)

Here, joining the charges did not convert the matter into a capital case, and the separate offenses were supported by strong evidence. Without joinder, Simon would still have faced the death penalty based on the special circumstance allegations that the murder of Anes was committed during the commission of a robbery and the murder of Magpali was committed during the commission of a robbery, kidnapping, and rape. (Former § 190.2, subd. (a)(17)(i)-(iii), now § 190.2, subd. (a)(17)(A)-(C).) Moreover, the multiple-murder special-circumstance allegation was available to the prosecution, even if the Sterling murder had not been joined, because the Anes/Magpali incident involved two murders. (See *People v. Ruiz*, *supra*, 44 Cal.3d at p. 607.) As a result, joining the charges did not convert the matter into a capital case.

Furthermore, there was strong evidence supporting each incident. So neither case posed an undue risk of unjustified conviction. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1202 ["In the present case, the evidence supporting each

35

of the murder cases was not weak and neither case posed the risk of an unjustifiable conviction"]; *People v. Thomas* (2012) 53 Cal.4th 771, 800 [finding "no significant risk of an unjustified conviction on any of the murder charges because . . . evidence in both cases was strong"].)  Because joinder did not bolster the possibility of conviction, joinder also did not bolster the possibility of the death penalty being imposed as punishment.  We find no clear showing of potential prejudice under this factor.

### ii.  Gross Unfairness

Even if we find that the trial court did not abuse its discretion in denying severance pretrial, we must also determine "whether events *after* the court's ruling demonstrate that joinder actually resulted in 'gross unfairness' amounting to a denial of defendant's constitutional right to fair trial or due process of law." (*People v. Merriman*, *supra*, 60 Cal.4th at p. 46.)  We find no violation of due process.

In determining whether joinder resulted in gross unfairness, we have observed that a judgment will be reversed on this ground only if it is reasonably probable that the jury was influenced by the joinder in its verdict of guilt.  (*People v. Merriman*, *supra*, 60 Cal.4th at p. 49.)  But, as noted above, both the Anes/Magpali charges and the Sterling charges were supported by strong evidence warranting conviction had the incidents been tried separately.  What is more, the fact that the jury found Simon guilty of first degree murder in the killings of Anes and Magpali, but only second degree murder of Sterling, "strongly suggests that the jury was capable of weighing the evidence and differentiating among [the] various charges." (*People v. Lucas* (2014) 60 Cal.4th 153, 217, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19; see also *People v. Jones* (2013) 57 Cal.4th 899, 927 ["Where the jury returns a guilty

36

verdict of a lesser crime, or, as here, fails to convict at all on some charges, we are confident the jury was capable of, and did, differentiate among defendant's crimes"]; *People v. Ruiz, supra*, 44 Cal.3d at p. 607 ["the fact that the jury found defendant guilty of only second degree murder of Tanya strongly suggests that the jury was capable of differentiating between defendant's various murders"].)

Simon argues nonetheless that joinder resulted in gross unfairness because the trial court failed to adequately caution jurors against considering evidence from the Anes/Magpali incident when rendering a verdict on the Sterling counts, and vice versa. But the court instructed the jury, pursuant to CALJIC No. 17.02, as follows: "Each count charges a distinct crime. You must decide each Count separately. The defendant may be found guilty or not guilty of any or all of the crimes charged. Your finding as to each Count must be stated in a separate verdict." Defense counsel also reminded the jury of its duty to consider the facts separately in his closing argument. Absent some showing to the contrary — a showing Simon has not provided — we presume the jury followed these instructions. (See *People v. Merriman, supra*, 60 Cal.4th at pp. 48-49 ["The record shows moreover that the jury was instructed on the elements of each of the charged crimes, told that 'each count charges a distinct crime,' and directed to 'decide each count separately.' (CALJIC No. 17.02.) Absent some showing to the contrary, we presume the jury followed the court's instructions. [Citation.] No such showing was made here"].)

Simon's reliance on *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073 (*Bean*) is unavailing. In that case, the Ninth Circuit held that, despite the state trial court's having instructed the jury pursuant to CALJIC No. 17.02, the court's refusal to sever two sets of charges deprived the defendant of a fair trial. (*Id.* at p. 1083.) *Bean* is distinguishable on several grounds. First, the prosecutor during closing argument there "repeatedly urged the jury to consider evidence of Bean's

37

'modus operandi' to determine whether he was guilty of *both* [sets of] crimes."
(*Ibid.*) Although the prosecutor here, in a couple of instances during closing argument, appeared to cross-reference the two incidents, these isolated remarks over the course of 80 pages of transcript did not approach the repeated conflation of events found in *Bean*. Second, unlike in *Bean*, there is no "substantial disparity" (*id.* at p. 1085) between the strength of the two cases here such that the evidence from one risked strengthening an "otherwise weak case" (*id.* at p. 1083). As explained above, the evidence supporting both sets of charges was quite strong here. Simon was arrested with the Anes/Magpali murder weapon, and Simon's DNA profile matched that of semen evidence collected from Magpali. Uncontroverted evidence also showed that Simon — after having been the aggressor — shot Sterling in the chest. Third, unlike in *Bean*, there is "affirmative evidence of the jury's ability to assess the [two incidents] separately." (*Id.* at p. 1086.) The jury here found Simon guilty of first degree murder in the killings of Anes and Magpali, but only second degree murder of Sterling. We therefore have no compelling reason to doubt that the jury succeeded in sufficiently compartmentalizing the evidence. (*Id.* at p. 1085.)

What we conclude in light of these factors is that Simon has not shown joinder to have resulted in gross unfairness such that he was deprived of a fair trial.

### 3. Failure to Instruct on Imperfect Self-Defense

Simon argues that the trial court erred in failing to instruct the jury on imperfect self-defense with respect to the Sterling homicide. We see no error.

#### a. Background

In arguing before the trial court for jury instructions on self-defense, defense counsel cited testimony that Sterling had been convicted of a prior assault,

38

Haynes's statements that she observed an argument outside between Sterling and Simon, testimony by Haynes and Gentry that they heard three gunshots fired (implying the existence of another gun), testimony by Gentry that Sterling was bigger than Simon, and testimony that the fatal shot was fired at close range. From this evidence, defense counsel asserted, "it appears from the record at least a reasonable inference could be drawn that Mr. Simon and Mr. Sterling are arguing with each other."

The prosecutor conceded there was evidence that Sterling and Simon had been arguing, but that any potential third shot fired most likely came from the same gun. The prosecutor continued that the defense failed to make a case for imperfect self-defense "because there's no evidence whatsoever of any fear or honest belief on [Simon's] part here," and "[b]ecause we have no idea whatsoever of any aggressive behavior by Mr. Sterling toward Mr. Simon."

The trial court denied Simon's request for a jury instruction on imperfect self-defense, stating "No, I don't see it, to be honest with you. I don't think there's a factual basis for this . . . ." The instructions jurors did receive gave them the option to find Simon guilty of the lesser included offense of voluntary manslaughter under a heat of passion or sudden quarrel theory, or to acquit Simon based on a theory of complete self-defense. Simon now challenges the trial court's refusal to instruct the jury on imperfect self-defense, arguing that a jury could have concluded that he had an actual but unreasonable belief that he needed to defend himself against imminent harm from Sterling.

### b. Legal Standard

An instance of imperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death. (*People v. Duff* (2014) 58 Cal.4th 527, 561.) Imperfect self-

39

defense differs from complete self-defense, which requires not only an honest but also a reasonable belief of the need to defend oneself. (*People v. Elmore* (2014) 59 Cal.4th 121, 133-134.) It is well established that imperfect self-defense is not an affirmative defense. (See *People v. Barton* (1995) 12 Cal.4th 186, 199-201 (*Barton*).) It is instead a shorthand way of describing one form of voluntary manslaughter. (*Id.* at p. 200.) Because imperfect self-defense reduces an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice, this form of voluntary manslaughter is considered a lesser and necessarily included offense of murder. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)

A trial court has a sua sponte duty to instruct the jury on a lesser included uncharged offense if there is substantial evidence that would absolve the defendant from guilt of the greater, but not the lesser, offense. (*People v. Waidla* (2000) 22 Cal.4th 690, 733 (*Waidla*).) Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed. (*People v. Manriquez* (2005) 37 Cal.4th 547, 587-588 (*Manriquez*); see also *Barton*, *supra*, 12 Cal.4th at p. 201, fn. 8 ["Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive' "].) Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense. (*Mendoza*, *supra*, 24 Cal.4th at p. 174; see also *Barton*, at p. 201 ["the need to [instruct sua sponte on imperfect self-defense] arises only when there is substantial evidence that the defendant killed in unreasonable self-defense, not when the evidence is 'minimal and insubstantial' " (fn. omitted)].)

We review de novo a trial court's decision not to give an imperfect self-defense instruction. (See *Manriquez*, *supra*, 37 Cal.4th at p. 581; see also *Waidla*, *supra*, 22 Cal.4th at p. 733 ["An appellate court applies the independent or de

novo standard of review to the failure by a trial court to instruct on an uncharged offense that was assertedly lesser than, and included, in a charged offense"].)

### c. Analysis

According to Simon, "a theory of unreasonable self-defense was supported by the evidence since jurors may have concluded that [he] actually believed in the need for self-defense, but that his belief was not objectively reasonable." In support of this claim, Simon emphasizes how, after his initial showing of aggressive behavior, he apologized, shook Sterling's hand, and hugged him before leaving the apartment.

We disagree. The facts, though hardly pellucid, suggest that Simon — not Sterling — was the aggressor in their confrontation. It was Simon who began cursing at Sterling after the latter identified himself as a member of IE, an apparent rival of Simon's gang. Despite Sterling lifting up his shirt to prove that he was unarmed, Simon asked for someone to retrieve the gun Simon had brought to the apartment. Simon asserts he was a changed man once he returned from the bathroom, claiming that he had "calmed down" at that point and that he had apologized to Sterling as he shook his hand. Yet moments later, Simon walked over to Williams and elbowed him in the face. When Gentry sought to intervene, Simon told her to "shut up," threatening to shoot her too. Once outside, Simon and Sterling began to argue. And in an interview with police, Jamal Brown said that Simon "totally shot [Sterling] cold blooded." Jamal remarked that Simon had "shot [Sterling,] what for I don't know." Jamal also insisted that he had heard only two gunshots.

Simon, meanwhile, does not point to any evidence indicating that Sterling was the aggressor. Nor does Simon present evidence that he ever perceived that Sterling — who was unarmed — posed a risk of imminent peril. Given the

41

paucity of support for Simon's position, our decision in *Manriquez* is also instructive. (*Manriquez*, *supra*, 37 Cal.4th at pp. 580-583.) There, we rejected the defendant's claim that the trial court improperly refused his request for a jury instruction on imperfect self-defense, noting that the record was "devoid of evidence" supporting the defendant's subjective fear. (*Id.* at p. 581.) The evidence there included how the defendant had allegedly told officers he " 'had heard some threats' " that the victim wanted to kill him. (*Id.* at p. 582.) A witness to the murder testified that the defendant appeared angry when he left the room to meet the victim, that the victim was unarmed, and that the victim asked the defendant, " 'What is your problem with me?' " (*Id.* at pp. 561-562.) The defendant did not testify at trial. (*Id.* at pp. 567-568.)

The record here is equally devoid of evidence tending to show Simon's subjective fear of Sterling. Simon, like the defendant in *Manriquez*, initiated any aggressive interactions — here, by cursing at Sterling for being a member of a rival gang. Similarly, the record indicates that Sterling was unarmed. Simon also did not testify, and there is no evidence he ever told anyone that he had acted out of fear.

To the extent Simon argues that the trial court's decision to give an instruction on complete self-defense required it to also instruct on imperfect self-defense, we find no error. Because we conclude there was not substantial evidence supporting Simon's actual belief that he was in imminent danger of great bodily injury or death, the trial court would not have erred had it likewise refused to instruct on complete self-defense. (See *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1270 ["Further, just because the court permitted instructions on perfect self-defense does not mean that substantial evidence supported the giving of an imperfect self-defense instruction. To the contrary, it would not have been error for the trial court to have denied perfect self-defense instructions with regard

42

to Contreras because no substantial evidence supported such a defense"]; see also *People v. De Leon* (1992) 10 Cal.App.4th 815, 824 ["It is hard to fault appellant's logic. If there was substantial evidence of his 'honest belief' for self-defense purposes, there was substantial evidence of his 'honest belief' for *imperfect* self-defense purposes. [¶] But we are satisfied, and so hold, there was not substantial evidence of 'honest belief' for either self-defense or imperfect self-defense"].)

We conclude the trial court did not err in refusing Simon's request to instruct on imperfect self-defense.

## C. Penalty Phase Issues

### 1. Victim Impact Evidence

Simon argues that the trial court committed reversible error in admitting victim impact evidence during the penalty phase of his trial. We are not convinced.

### a. Background

Prior to the penalty phase, Simon moved to exclude victim impact evidence on multiple grounds. First, Simon called for exclusion of testimony regarding the appropriate punishment for or characteristics of Simon. The trial court agreed. Second, Simon requested to limit victim impact testimony to a single surviving family member. The trial court denied the motion, noting that "California has never placed" such a limitation. Third, Simon sought to exclude emotional, tearful, or angry testimony, explaining that some testimony had been very emotional in the first penalty trial. The trial court agreed that testimony may not be so emotional that it becomes unduly prejudicial. The court reasoned, however, that it could not ex ante exclude or even distinguish what qualifies as "overly emotional or inflammatory." The court therefore ruled that this issue was something to monitor as the proceedings developed.

43

Fourth, Simon moved to exclude any testimony or evidence regarding awards or academic achievements of the victims — a request the trial court promptly denied. Fifth, Simon asked to exclude artwork by Magpali. The trial court denied the motion but stipulated that such evidence not be "overly time consuming or overly prejudicial." Similarly, Simon moved to exclude "testimony regarding future plans" of the victims. The trial court ruled such evidence admissible, reiterating again that such testimony may not be overly time consuming or specific.

Sixth, Simon sought to exclude photographs and testimony going back to the victims' births, suggesting that any such evidence be limited to "a period of time closer to the time of death." The trial court denied Simon's objections to both the baby photographs and the testimony. And seventh, Simon requested that all victim impact evidence be excluded because such testimony is so broad that it violates the Eighth Amendment to the United States Constitution and article 1, section 17 of the California Constitution. The trial court denied the motion while repeating that there would be limitations. The court recognized that the critical question is whether victim impact evidence becomes "overly time consuming, overly repetitious, things of that nature," which could not be determined at a pretrial hearing.

### b. Evidence Presented

#### i. Sherry Magpali

Two victim impact witnesses testified regarding Sherry Magpali: her sister Jasmine and brother Jeffrey.

At the time of her death, Sherry was a 19-year-old student at a local community college, having graduated magna cum laude from high school the year before. Jasmine and Jeffrey described their sister as a creative, fun person with a

lot of friends.  Sherry enjoyed singing, playing dress up, and taking pictures with her siblings.  She also hoped to become an artist and was interested in graphics, Japanese animation, and poetry.  Some of Sherry's artwork was entered into evidence, along with photographs of Sherry as a baby, young child, and young adult.

The night of the incident, Sherry asked Jasmine and Jeffrey to go with her to the party, but both declined.  The next day, her siblings were at a church retreat when they were pulled aside and told they had to be taken home.  Although they were not told what had happened, Jasmine said she already knew something was wrong.  Jasmine described getting home, hearing people screaming, seeing her mother lying on the floor after fainting, and no one telling her what was going on.  Jasmine did not learn about how her sister was murdered until she read the newspaper.  Jasmine described being angry when she heard about the way her sister was killed.  And as a result of her sister's death, Jasmine said she became introverted and was no longer a trusting person.  She said her brother Jeffrey became the same way.

Jeffrey testified that at first he did not believe Sherry had been murdered because she was such a strong person.  He said it hurt knowing how his sister died and that it would have been different if Sherry had died some other way, like in a car accident or from a medical condition.  He said it was also difficult to attend the funeral because that was when he realized his sister was really gone.

Jasmine described the impact of Sherry's death on their mother.  For years after the incident, Jasmine woke up to her mother crying in the middle of the night.  She also explained that the family did not talk to each other much anymore; holidays, she said, felt empty.

*ii. Vincent Anes*

Regarding Vincent Anes, three victim impact witnesses testified: his mother Priscilla Severson, his stepfather Timothy Severson, and his brother Dino Anes. Jurors were shown approximately 11 photographs of Vincent, ranging from age seven to death.

Priscilla described Vincent as a good, sweet, and thoughtful boy who was never in trouble. Vincent was a playful, but obedient, son who always did his homework and helped his younger brother with math. Vincent had a close connection with his stepfather, who taught Vincent how to work on cars. At the time of his death, Vincent was a senior in high school and a good student. Vincent planned on joining the military, then going to college to become a dentist.

The night of the incident, Priscilla was awakened by Vincent's friends, asking if he was home. She did not understand what Vincent's friends were saying, though, and thought Vincent might have just been in a car accident. Dino was also awakened and recalled people panicking and screaming. Priscilla called her parents, who lived nearby, and they all drove to the park. On the way, Dino prayed that his brother was still alive.

Upon arrival, Priscilla and Dino saw Vincent's car but were still unaware that Vincent was dead. An ambulance arrived too, but no one seemed to be helping the person in the car — this was the first indication to Dino that his brother was dead. It was only after Priscilla's father told her the person in the vehicle was Vincent that she knew her son had died.

Timothy testified that he blamed himself for Vincent's death. Timothy, who served in the military and was stationed in Nevada at the time, described how it was difficult to cope with knowing he had left his family in a place where Vincent was murdered. The night of the incident, Timothy was awakened by a coworker saying that he had a phone call. Because Priscilla was so distraught,

46

though, she was unable to speak, so her brother had to explain what had occurred. Timothy processed paperwork through the Red Cross and got permission from his superiors to leave, but he was only able to stay with his family in California for a few weeks. It was difficult to leave so quickly, he told the jury.

Priscilla explained that home life was happy before Vincent's death. After the incident, though, she became very fearful and strict toward Dino. Afraid that something similar to what happened to Vincent might happen to her other son, Priscilla would turn the ringer of the house phone off on the weekends so that Dino's friends could not reach him. Although she stopped doing this at some point because it was not fair to Dino, she still lived in fear whenever Dino left the house. Priscilla also explained that she was bothered by the way Vincent died and that she still had nightmares.

Vincent's death had a significant impact on Dino, who said he became a loner. Dino testified that it was difficult to accept his brother's death because of how he was killed; had Vincent died because of a car accident or a medical condition, it would have been different. Dino could not accept how his brother was "brutally murdered" and "humiliated." Dino went on to explain that when he could not sleep at night, he thought about his brother. Dino said he did not pray anymore because God did not answer his prayers the night Vincent was murdered.

The family moved away from the area four months after the incident, but for two years Priscilla traveled to visit the cemetery three or four times a week. Priscilla described how she saved all of Vincent's belongings, including the last bottle of soda she had shared with him. She explained that the family no longer celebrated holidays, finding it meaningless to even put up a Christmas tree.

47

### iii. Michael Sterling

Michael Sterling's sister-in-law, Dyanne Sterling, testified about the effect of Michael's death on her husband (i.e., Michael's brother) and son. Michael was very close to his three brothers, who were all affected by Michael's death. Dyanne's son, who was six when Michael died, was also affected. He cried frequently and missed his uncle.

### c. Legal Standard

In a capital case, the Eighth and Fourteenth Amendments to the United States Constitution permit introduction of evidence about the victim or the impact of the defendant's acts on the victim's friends and family. (*Payne v. Tennessee* (1991) 501 U.S. 808, 825-827.) Such victim impact evidence is only barred by the federal Constitution if it is so unduly prejudicial that it renders the trial fundamentally unfair. (*People v. Kopatz* (2015) 61 Cal.4th 62, 90 (*Kopatz*).) Fundamental unfairness results when testimony "invite[s] the jury to make its penalty determination on a purely irrational basis." (*People v. Taylor* (2010) 48 Cal.4th 574, 646.) California law provides further that victim impact evidence is admissible under section 190.3, factor (a) as a "circumstance of the crime." (*People v. Edwards* (1991) 54 Cal.3d 787, 835-836 (*Edwards*).) Pursuant to factor (a), trial courts may allow emotional though relevant evidence, but not irrelevant information or inflammatory rhetoric that elicits purely emotional or irrational responses from the jury. (*Id.* at p. 836; see also *People v. Pollock* (2004) 32 Cal.4th 1153, 1180.)

We review the trial court's admission of victim impact evidence for abuse of discretion. (*People v. Trinh* (2014) 59 Cal.4th 216, 245.)

### d. Analysis

On appeal, Simon raises three arguments. First, the amount and nature of the victim impact evidence proffered below violated the due process clause of the

Fourteenth Amendment to the United States Constitution.  Second, the scope of victim impact evidence admissible under section 190.3, factor (a) should be limited to characteristics of the victims known or reasonably apparent to Simon at the time of the offense, and a more expansive interpretation renders the statute unconstitutionally vague under the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution.  Third, the proposed victim impact evidence should have been excluded under Evidence Code section 352 because the risk of undue prejudice substantially outweighed the evidence's probative value.

### i.  Due Process

Simon argues that the victim impact evidence presented below violated the due process clause of the Fourteenth Amendment to the United States Constitution because it was so unduly prejudicial that it rendered the penalty phase fundamentally unfair.  Simon contends the amount, and emotional nature, of the victim impact evidence was so inflammatory that the jury was led to make a "passionate, irrational, and purely subjective" decision based on the sorrow of the victims' families.

But we need not address whether the amount or emotional nature of the victim impact evidence was unconstitutionally prejudicial.  Because Simon failed to properly object to the evidence, he forfeited the issue on appeal.  (See *People v. Wilson* (2005) 36 Cal.4th 309, 357 [concluding that "defendant forfeited his claim because he failed to object to the testimony as exceeding the scope of section 190.3, factor (a)"].)  Although Simon raised many objections to the scope of permissible victim impact evidence prior to the penalty phase, the trial court reached few express rulings:  (1) testimony need not be limited to one witness per victim, (2) evidence of awards, artwork, achievements, and future plans were not

49

per se inadmissible, and (3) testimony and evidence need not be limited to the time surrounding the victims' deaths.

The trial court also warned that the victim impact evidence should not be overly time consuming or overly emotional, but the court deferred making any specific rulings on this score pretrial. It was therefore incumbent upon Simon to monitor the victim impact evidence on an ongoing basis during the penalty phase and raise any specific objections at that time. (See *People v. Romero and Self*, *supra*, 62 Cal.4th at pp. 45-46 [finding victim impact evidence claim "forfeited" because the "motion in limine sought to broadly exclude all victim impact evidence on constitutional grounds, and did not specifically object to the admission of any particular witness's testimony anticipated in this case"; instead, "it was incumbent on defendants to object if they believed the testimony actually presented was 'excessive, improper, inflammatory, and highly prejudicial' "].)

Even if Simon's claim were not forfeited, his argument fails on the merits because the victim impact evidence was not unduly prejudicial. The family members' testimony here properly described the nature of their relationships with the victims, how they learned about the crimes, and how the crimes impacted their lives. (See *Kopatz*, *supra*, 61 Cal.4th at p. 91 [finding no error where "the family members' testimony properly explained the nature of their relationship with the victims, the immediate effects of the murders, and the residual and continuing impact of the murder on their lives"]; *People v. Chism* (2014) 58 Cal.4th 1266, 1326-1327 (*Chism*) [finding no error where the family members' testimony "was limited to explain the nature of their relationship with the victim, the immediate effects of the murder, and the residual and continuing impact of the murder on their lives"].) Furthermore, neither the number of witnesses — six — nor the amount of testimony — 59 pages' worth — was excessive. (See, e.g., *People v. Romero and Self*, *supra*, 62 Cal.4th at p. 46 [no error where victim impact

testimony consisted of six witnesses spanning 96 pages of the reporter's transcript]; see also *People v. Pearson* (2013) 56 Cal.4th 393, 464-467 [victim impact testimony of 13 witnesses]; *People v. Nelson* (2011) 51 Cal.4th 198, 219-221 [victim impact testimony of one victim's six family members].)

Moreover, the content of the victim impact evidence was not so emotional that it became unduly prejudicial. Simon is likely correct that the testimony painted a picture of "the complete devastation of two families," but that is to be expected when loved ones have been brutally murdered. (See *Kopatz*, *supra*, 61 Cal.4th at pp. 90-91 [explaining that the devastating effect of a capital crime on loved ones and the community is generally relevant and admissible]; *Chism*, *supra*, 58 Cal.4th at p. 1328 ["Evidence presented at the penalty phase need not be devoid of emotional content"].) The question is not simply whether victim impact evidence was emotional or demonstrated the devastating effect of the crime; rather, it is whether the testimony invited an irrational response from the jury. (See *People v. Tully* (2012) 54 Cal.4th 952, 1030.) Simon, however, provides no persuasive basis for us to conclude that the testimony presented in this case triggered such a response. And our review of the record indicates the testimony was not so emotional that the trial court's failure to exclude it amounted to an abuse of discretion or rendered Simon's trial fundamentally unfair. (See *People v. Trinh*, *supra*, 59 Cal.4th at pp. 245-246.)

### ii. Vague

Simon argues that in *Edwards*, *supra*, 54 Cal.3d 787, we incorrectly held that victim impact evidence admitted under section 190.3, factor (a) may encompass facts unknown to the defendant at the time of the offense. As support, Simon relies on Justice Kennard's concurring and dissenting opinion in *People v. Fierro* (1991) 1 Cal.4th 173, which advanced such an interpretation. (*Id.* at

51

pp. 262-263 (conc. & dis. opn. of Kennard, J.).) Simon also argues that interpreting section 190.3, factor (a) to include facts unknown or not reasonably apparent to him at the time of the offense renders the statute unconstitutionally vague.

As Simon acknowledges, however, we have rejected these arguments — and we have done so repeatedly — since *Edwards* was decided. (See, e.g., *People v. Montes* (2014) 58 Cal.4th 809, 877; *People v. Zamudio* (2008) 43 Cal.4th 327, 364-365; *People v. Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1057; *People v. Boyette* (2002) 29 Cal.4th 381, 445, fn. 12.) Simon offers no different or persuasive reason for us to revisit our prior rulings.

### iii. Evidence Code Section 352

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Simon contends that the victim impact evidence should have been excluded under this provision as substantially more prejudicial than probative. What he argues is that the victim impact evidence was "bound to intensify natural feelings of sympathy for the victims and their families and may have encouraged a desire for retribution against [Simon by] inviting an emotional and purely subjective response" because it was not limited to a single witness or to the time surrounding the victims' deaths, and it was "emotionally charged and detailed."

We find no abuse of discretion here. (See *People v. Brady* (2010) 50 Cal.4th 547, 583 [reviewing cumulative effect of victim impact testimony under Evid. Code, § 352 for abuse of discretion].) The victim impact evidence was not

52

unduly prejudicial because the testimony did not invite the jury to form an " 'irrational, purely subjective response.' " (*Edwards*, *supra*, 54 Cal.3d at p. 836.) The testimony here properly described how the murders impacted the witnesses' lives and did not paint a picture of the crimes as any more disturbing than the evidence already showed. (See *Kopatz*, *supra*, 61 Cal.4th at p. 91; *Chism*, *supra*, 58 Cal.4th at pp. 1326-1327.) Nor was it improper for the family members to testify that the nature of the murders made the aftermath especially difficult for them. (See *People v. Montes*, *supra*, 58 Cal.4th at p. 880 [finding no error where each of the "relative[s] testified the unexpected and abrupt nature of [the victim's] death made it especially painful"].) As a result, Simon has failed to show the trial court abused its discretion in concluding that the probative value of the victim impact evidence was not substantially outweighed by any risk of undue prejudice.

### 2. Victim Impact Instructions

Simon argues that the trial court failed to fulfill its sua sponte duty to properly instruct the jury as to victim impact evidence. We find no error.

### a. Background

At the penalty phase, the trial court instructed jurors with a modified version of CALJIC No. 8.84.1: "You will now be instructed as to all of the law that applies to the penalty phase of this trial. [¶] . . . [¶] You must determine what the facts are from the evidence received during the trial unless you are instructed otherwise. You must accept and follow the law that I state to you. You may consider pity, sympathy, or mercy for the defendant in determining the penalty in this case which you find to be warranted under the circumstances. [¶] You must neither be influenced by bias or prejudice against the defendant, nor swayed by public opinion or public feeling. Both the People and the defendant have the right to expect that you will consider all the evidence, follow the law, exercise your

53

discretion conscientiously, and reach a just verdict." The trial court also instructed the jury with CALJIC No. 8.85.

On appeal, Simon acknowledges that he "did not request an instruction regarding the appropriate use of victim impact evidence." He argues, however, that this failure did not absolve the trial court of its sua sponte duty to provide jurors with the guidance necessary for them to properly consider the victim impact evidence in the case. According to Simon, the trial court's failure to give an appropriate limiting instruction violated his "right to a decision by a rational and properly-instructed jury, his due process right to a fair trial, and his right to a fair and reliable capital penalty determination" under the federal and state constitutions.

Simon contends that an appropriate instruction, derived from *State v. Koskovich*, (N.J. 2001) 776 A.2d 144, 177, and *Commonwealth v. Means*, (Pa. 2001) 773 A.2d 143, 159, would have been: "Victim impact evidence is simply another method of informing you about the nature and circumstances of the crime in question. You may consider this evidence in determining an appropriate punishment. However, the law does not deem the life of one victim more valuable than another; rather, victim impact evidence shows that the victim, like the defendant, is a unique individual. Your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence. Finally, a victim-impact witness is precluded from expressing an opinion on capital punishment and, therefore, jurors must draw no inference whatsoever by a witness's silence in that regard."

### b. Legal Standard

In general, a defendant's failure to request a clarifying jury instruction forfeits any objection thereto. (*People v. Russell* (2010) 50 Cal.4th 1228, 1273;

54

see also *People v. Arias* (1996) 13 Cal.4th 92, 171 ["defendant's failure to request a clarifying instruction waives that claim"]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1192 ["if defendant believed the instruction was unclear, he had the obligation to request clarifying language. . . . [¶] . . . [¶] Defendant's failure to request such clarifications at trial bars appellate review of the issue"].)

Nonetheless, a trial court has a duty to instruct sua sponte "on those general principles of law that are closely and openly connected with the facts before the court and necessary for the jury's understanding of the case." (*People v. Price* (1991) 1 Cal.4th 324, 442.)

### c. Analysis

Simon concedes that he failed to request a clarifying jury instruction pertaining to victim impact evidence. His claim, hence, is forfeited. (See *People v. Russell*, *supra*, 50 Cal.4th at p. 1273.)

Simon argues nevertheless that the trial court had a sua sponte duty to deliver an appropriate limiting instruction akin to the one proposed above. We have rejected the same argument — and the exact same proposed instruction — before. Indeed, we have repeatedly held that the trial court's use of jury instructions CALJIC Nos. 8.84.1 and 8.85 is sufficient to address a defendant's concerns about the proper use of victim impact evidence, and is consistent with his or her federal and state constitutional rights to due process, a fair trial, and a reliable penalty determination. (See *People v. Zamudio*, *supra*, 43 Cal.4th at pp. 369-370; see also *People v. Carrington* (2009) 47 Cal.4th 145, 198 ["We previously have rejected these same contentions"]; *People v. Bramit* (2009) 46 Cal.4th 1221, 1245 ["We recently considered this instruction and concluded it is neither required nor appropriate"].)

As the jury here was instructed according to CALJIC Nos. 8.84.1 and 8.85, and Simon offers no persuasive reason to revisit our prior rulings, we see no error.

### 3. Prosecution Rebuttal Evidence

Simon argues that the trial court committed reversible error by admitting irrelevant and highly prejudicial rebuttal evidence at the penalty phase. We are not persuaded.

### a. Background

During the penalty phase, Simon presented expert witness testimony regarding his brain injuries, as well as testimony from his mother and relatives regarding his difficult childhood and their loving relationships with him. Simon's family members testified that he was a good role model, a "disciplined young person," and "quite a good kid." His cousin Richardson testified that Simon was supportive and helpful when she was pregnant. Simon's half sister also testified that Simon had given her good advice in the past, dissuading her from adopting a lifestyle of crime.

At the close of the defense's case, the prosecution sought to introduce as rebuttal evidence a letter that Simon purportedly had written to his wife, Keisia, while incarcerated. The letter contained threatening and explicit language directed at Keisia, calling her "bitch" and "roadkill" and warning that Simon would "get" her. The prosecution argued that it was admissible to counter the evidence Simon had introduced of his good character. In particular, the letter was necessary to counter the defense evidence that Simon was "a person of such character that he's important for his family members to maintain a relationship with him, maybe someone they can go to for advice." Defense counsel objected to the letter's admission, stating: "I haven't gone into [Simon's] character trait for violence." The trial court overruled this objection, and the letter was read to the jury.

56

Simon now contends that the trial court committed reversible error in admitting this evidence. This decision, he contends, violated his rights to have reasonable time limits placed on the admission of aggravating evidence, to receive due process and a fair trial, and to a reliable penalty determination. Simon asserts that because he did not introduce any evidence relating to his character for nonviolence, evidence showing his character for violence constituted improper rebuttal.

### b. Legal Standard

When a defendant claims that his or her general character weighs in favor of mercy, a prosecutor is entitled to rebut that claim with evidence or argument offering a different account of the defendant's character. (See *People v. Loker* (2008) 44 Cal.4th 691, 709 ["When a defendant places his character at issue during the penalty phase, the prosecution is entitled to respond with character evidence of its own"]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 791.) If the defendant's good character evidence "was not limited to any singular incident, personality trait, or aspect of his background" and "painted an overall picture of an honest, intelligent, well-behaved, and sociable person incompatible with a violent or antisocial character," the prosecution may introduce appropriate rebuttal evidence of the scope offered. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1072.) But that scope must still be specific, as we have rejected the idea that any evidence introduced for the defendant's good character will open the door to any and all bad character evidence from the prosecution. (*People v. Rodriguez, supra*, 42 Cal.3d at p. 792, fn. 24.)

A trial court has broad discretion when determining the admissibility of rebuttal evidence, and we review a trial court's decision to admit such evidence for abuse of discretion. (See *People v. Valdez* (2012) 55 Cal.4th 82, 170 ["absent

57

palpable abuse, an appellate court may not disturb the trial court's exercise of that discretion"].)

### c. Analysis

Admitting the letter here was not an abuse of discretion. The vile, threatening language Simon employed in the letter to his wife undermined the defense's evidence that Simon was supportive of the women in his life and was someone they could turn to for sound advice. The letter's menacing language — including repeated threats to Keisia's life — suggested that Simon possessed negative, aggressive attitudes toward women that stood in stark contrast to the testimony of his positive character attributes.

Our decision in *People v. Rodriguez*, *supra*, 42 Cal.3d 730, is instructive. There, we affirmed the ability of the prosecutor to rebut evidence of the defendant's general character. (*Id.* at p. 791.) The prosecutor referred to an incident where the defendant had supposedly reached for a sawed-off shotgun in the back seat during a traffic stop. (*Id.* at pp. 745, 791.) We held that the incident was properly admitted, as it rebutted evidence that the defendant "was a kind, loving, contributive member of his community, regarded with affection by neighbors and family." (*Id.* at p. 791.) Similarly, the defense evidence here sought to portray Simon as a kind individual who was supportive of the women in his life. The letter refuted that portrayal.

As the letter, though sharply worded, was relatively short in comparison to the good character evidence the defense had offered, and because it pertained directly to that evidence, we conclude the trial court did not abuse its discretion in allowing it.

### 4. *Reference to Other Murder Cases*

Simon claims that the trial court violated his rights to counsel and due process at the penalty phase by refusing to allow defense counsel to refer to other prominent murder cases during closing argument. We disagree.

### *a. Background*

During closing argument, defense counsel urged the jury when considering whether Simon deserved the death penalty to "put him in that category of convicted offenders of special circumstances murder, and then evaluate whether he's the worst in that — or among the worst in that category." Using a pyramid graphic to illustrate the different categories of murder, defense counsel argued that only a narrow group of people liable for a special circumstances murder qualify for the death penalty. Defense counsel then referred to the murderers Timothy McVeigh and Charles Manson as points of comparison for the jurors to consider when deciding if Simon deserved to die. After hearing this remark, the prosecutor objected.

During a discussion outside the jury's presence, the trial court stated, "I think the comparison argument need be made to a point, up to the point to where we're talking about first degree murders are not available for death penalty," but it expressed concerns with comparing first degree murders with special circumstances. The prosecutor contended that defense counsel's argument that Simon was "not as bad as" Timothy McVeigh and Charles Manson was improper because the penalty phase requires an individual determination based on the defendant's own crime and background. The prosecutor cited *People v. Jenkins* (2000) 22 Cal.4th 900, 1052 to support the proposition that under section 190.3, factor (a), a jury's consideration of the circumstances of the crime committed must be individualized, not comparative. The court sustained the objection, agreeing with the prosecutor that "[i]t comes down to an individual determination of guilt

and not a comparative balancing of whether or not [Simon's] crime is worse than Timothy McVeigh's." The court did not, however, give a curative instruction to the jury.

On appeal, Simon relies on *People v. Millwee* (1998) 18 Cal.4th 96, 153 to show that during penalty phase closing argument counsel may discuss "other cases and crimes in order to assist jurors in exercising sentencing discretion." Simon suggests that trial courts may only limit the scope of defense counsel's closing argument when that argument would be overly time consuming. Further, Simon contends that because the trial court here based its ruling on an incorrect interpretation of law, its limitation cannot be an appropriate exercise of discretion. Simon maintains that these alleged errors were prejudicial and "skewed the weighing process in favor of the prosecution," resulting in the denial of Simon's rights to due process, a fair trial, effective assistance of counsel, and a reliable penalty determination.

### b. Legal Standard

Criminal defendants enjoy a constitutional right to have counsel present closing argument to the trier of fact. (*People v. Benavides* (2005) 35 Cal.4th 69, 110; see *Herring v. New York* (1975) 422 U.S. 853, 858 ["There can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial"].) This right, however, is subject to certain limits. (*People v. Benavides*, *supra*, at p. 110.) A trial court may impose reasonable time limits and may ensure that argument does not "stray unduly from the mark." (*People v. Marshall* (1996) 13 Cal.4th 799, 854-855.) Trial courts have broad discretion to control the duration and scope of closing arguments. (See *Herring v. New York*, *supra*, at p. 862 ["In all these respects [the trial court] must have broad discretion"].)

We review a trial court's decision to limit defense counsel closing argument for abuse of discretion. (See *People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1184.)

### c. Analysis

On numerous occasions, we have upheld a trial court's refusal to allow defense counsel to compare the defendant to specific well-known murderers or their crimes. (See, e.g., *People v. Virgil* (2011) 51 Cal.4th 1210, 1285-1287; *People v. Hughes* (2002) 27 Cal.4th 287, 399-400; *People v. Roybal* (1998) 19 Cal.4th 481, 528-529 (*Roybal*); *People v. Marshall*, *supra*, 13 Cal.4th at pp. 853-855.) So long as the defendant is allowed to "make his central point and to argue in general terms that there were 'worse cases' than his," the trial court's refusal is within its broad discretion. (*People v. Hughes*, at p. 400.) As relevant to the present case, we have held that a trial court's instruction that jurors may not compare the defendant's crime with any other crime does not constitute prejudicial error. (*Roybal*, at p. 529.)

As an initial matter, we disagree with Simon's suggestion that a trial court may only limit defense counsel's closing argument if it is overly time consuming. To the contrary, trial courts have "broad discretion" to limit both the duration and scope of closing arguments. (*Herring v. New York*, *supra*, 422 U.S. at p. 862.) Thus, the trial court's decision to preclude Simon's defense counsel from making specific references to well-known murderers need not be based on time considerations only.

We also disagree with Simon's contention that the trial court improperly limited defense counsel during closing argument. The trial court's refusal to allow defense counsel to compare Simon's crimes with the murders committed by the likes of Timothy McVeigh and Charles Manson was well within its broad

61

discretion. (See *People v. Virgil*, *supra*, 51 Cal.4th at pp. 1285-1287 [finding no abuse of discretion where trial court prohibited defense counsel from referencing prosecutions of O.J. Simpson and the Menendez brothers].)

We upheld a similar limitation in *People v. Farley* (2009) 46 Cal.4th 1053 (*Farley*). In *Farley*, the defendant argued that the trial court erred by prohibiting defense counsel from arguing at closing that the defendant's crimes were not as bad as other capital defendants. (*Id.* at pp. 1129-1130.) Defense counsel sought to refer to infamous murderers like Richard Ramirez, David Carpenter, and Ramon Salcido. (*Id.* at p. 1130.) But the trial court "ruled that counsel would 'not be permitted to engage in a comparative analysis of other death penalty cases or other murder cases . . . .' " (*Ibid.*) While the trial court barred defense counsel from mentioning specific cases, names, and penalties, it permitted counsel to argue " 'this is not a child torture case or something like that.' " (*Ibid.*) We upheld the trial court's refusal, explaining that counsel was not precluded from making his central point that the "defendant's murders were not 'the worst of the worst.' " (*Id.* at p. 1131.) The same is true here. Although the trial court below did not allow defense counsel to mention specific names, defense counsel was still permitted to ask the jury to consider if Simon was among the worst in the category of convicted offenders of special-circumstances murder. As in *Farley*, then, we find no constitutional violation.

Nor would we likely have found such a violation had the trial court instructed the jury against comparing Simon's crimes to any others. (See *Roybal*, *supra*, 19 Cal.4th at pp. 528-529.) In *Roybal*, defense counsel sought to compare the defendant's case to the so-called "Billionaire Boys Club" murders. (*Id.* at p. 528.) The trial court sustained an objection by the prosecutor and instructed jurors, " '[Y]ou may not attempt to compare this crime, this murder, with any other murder. In other words, you can't indulge in comparisons. . . . *You focus on*

62

*the facts associated with this case, with this defendant, with this crime.'* " (*Ibid.*, italics added.) We upheld the trial court's instruction, reasoning that the defendant could still argue his central point that the circumstances of his crime were mitigated by his background and emotional and mental disorders. (*Id.* at p. 529.)

Here, as in *Roybal*, Simon's defense counsel was not precluded from making his central argument that not every person (Simon included) found liable for special circumstances murder deserves the death penalty. And even had the trial court admonished the jury with a curative instruction following defense counsel's comparative references — which the court did not do — *Roybal* demonstrates that such an instruction would likely have been proper. (*Roybal*, *supra*, 19 Cal.4th at p. 529.) Thus, the trial court's decision here did not constitute an abuse of discretion.

### 5. *Other Challenges to the Death Penalty Statute*

Simon raises numerous challenges to California's death penalty scheme that we have repeatedly considered and rejected. He fails to persuade us to reconsider our previous holdings. As a result, we again conclude:

The death penalty is not unconstitutional for failing broadly to "adequately narrow the class of murderers eligible for the death penalty." (*Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 468.) Section 190.3, factor (a), which permits the jury to consider the circumstances of a defendant's crime in determining whether to impose the death penalty, does not license the jury to impose death in an arbitrary and capricious manner in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (*People v. Boyce* (2014) 59 Cal.4th 672, 723 (*Boyce*); *People v. Enraca* (2012) 53 Cal.4th 735, 769.)

63

Nor is the death penalty unconstitutional "for failing to require proof beyond a reasonable doubt that aggravating factors exist, outweigh the mitigating factors, and render death the appropriate punishment." (*Boyce*, *supra*, 59 Cal.4th at pp. 723-724.) This conclusion is not altered by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, and *Ring v. Arizona* (2002) 536 U.S. 584. (*Boyce*, at p. 724.) Neither does the federal Constitution require that the jury make written findings regarding aggravating factors. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 150.)

Section 190.3 does not require California courts to undertake a comparison between the case at bar and other similar cases with respect to the relative proportionality of the sentence imposed. Nor does the federal Constitution mandate such intercase proportionality review. (*People v. Contreras* (2013) 58 Cal.4th 123, 173.)

During the penalty phase, the jury may consider a defendant's unadjudicated criminal activity and need not unanimously agree beyond a reasonable doubt that such criminal activity occurred. (*People v. Nelson*, *supra*, 51 Cal.4th at p. 226.)

The use of adjectives such as "extreme" and "substantial" in the list of potential mitigating factors in section 190.3 does not unconstitutionally obstruct the jury's ability to consider mitigating evidence. (*People v. Martinez* (2010) 47 Cal.4th 911, 968; see *Boyce*, *supra*, 59 Cal.4th at p. 724.) Moreover, the trial court "need not instruct the jury that mitigating factors can be considered only in mitigation." (*Boyce*, at p. 724.)

California does not deny capital defendants equal protection of the law by providing certain procedural protections to noncapital defendants that are not afforded to capital defendants. (*People v. Williams* (2013) 58 Cal.4th 197, 295.)

International norms and treaties do not render the death penalty unconstitutional as applied in this state.  (*People v. Williams*, *supra*, 58 Cal.4th at pp. 295-296.)

Finally, the cumulative impact of these purported deficiencies in California's death penalty scheme does not render the penalty unconstitutional. We have rejected each of Simon's challenges to the death penalty statute, and these challenges are no more persuasive when considered together.  (See *People v. Williams*, *supra*, 58 Cal.4th at p. 296; *People v. Garcia* (2011) 52 Cal.4th 706, 764-765.)

### III. CONCLUSION

For the reasons stated above, we affirm the judgment in its entirety.

**CUÉLLAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Simon

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S102166
**Date Filed:** July 18, 2016

_____

**Court:** Superior
**County:** Riverside
**Judge:** Gordon R. Burkhart

_____

**Counsel:**

Kimberly J. Grove, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens, Robin Derman and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kimberly J. Grove
P.O. Box 425
Ligonier, PA  15658
(724) 238-3497

Eric A. Swenson
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 645-2216