Filed 11/1/22  P. v. Serrano CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C094290 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FE-2020-0000575) |
| v. | |
| NOE SERRANO, | |
| Defendant and Appellant. | |

This case arises out of a drive-by shooting in Stockton.  A jury found defendant Noe Serrano guilty of second degree murder (Pen. Code, § 187),[1] willful and malicious discharge of a firearm from a motor vehicle at another person other than an occupant of a motor vehicle (§ 26100, subd. (c)), felon in possession of a firearm (§ 29800, subd. (a)(1)), and driving in willful or wanton disregard for the safety of persons or property

---

[1]  Undesignated statutory references are to the Penal Code.

while fleeing from a pursuing peace officer (Veh. Code, § 2800.2, subd. (a)). The jury also found true the firearm enhancement (§ 12022.53, subd. (d)), and the special circumstance that defendant intentionally perpetrated the murder by discharging a firearm from a motor vehicle at another person outside the vehicle with the intent to inflict death (§ 190.2, subd. (a)(21)). The trial court sentenced defendant to an aggregate term of 48 years to life in prison.

Defendant timely appealed; after record augmentation and several continuances of the briefing schedule at the parties' request, the case was fully briefed on June 30, 2022, and assigned to this panel on July 29, 2022. The parties waived argument and the case was submitted on September 26, 2022.

On appeal, defendant contends reversal is required due to an instructional and sentencing error. He further contends, and the Attorney General concedes, that the matter must be remanded for resentencing in view of our Supreme Court's recent decision in *People v. Tirado* (2022) 12 Cal.5th 688 and the recent changes in the law effected by Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731) (Senate Bill No. 567). We will vacate defendant's sentence and remand for resentencing. We otherwise affirm the judgment.

FACTUAL BACKGROUND

*The Shooting*

On the evening of January 11, 2020, defendant and two other men, Marquann Jones and Daquan Hunter, were hanging out and drinking alcohol at M&M Market (the market) in southeast Stockton. Jones and Hunter knew each other from the neighborhood and had mutual friends. Neither Jones nor Hunter knew defendant, although Hunter had seen defendant at a nearby market in the past. Defendant, who appeared to be intoxicated, was arguing and starting fights with people at the market. He was loud, slurring his words, acting aggressive, and "mean mugging" people, i.e., staring "too hard" at them. When the owner of the market told the men to leave the area, defendant, who

2

was an "angry dude," became agitated and said, "fuck you" or "fuck this store." Shortly thereafter, Dustin Burt, a close family friend of Jones and a "[n]eighborhood friend" of Hunter, arrived at the market in his truck. Jones greeted Burt, who did not appear to be angry or upset.

While defendant was walking toward his car and looking in the direction of Jones, Hunter, and Burt, he said, "Fuck this side of town, not from here." Defendant also said something about the east side, that he was not from "this part of south," and "fuck" the "south side" and the "MOB,"[2] which is a name used by a gang in that part of Stockton. Defendant, who had a mean look on his face, warned everyone to get out of his way, and said, "bitch ass niggas watch." When Burt said, "What did you just say?" defendant did not respond. Burt, who appeared upset and disrespected, walked to his truck. At that point, Jones was concerned because defendant was "disrespecting the corner" and causing "trouble."

Shortly thereafter, defendant started "[c]reepin"; that is, he drove his white car slowly in front of the market on the wrong side of the street toward Burt's truck and made gang signs. Defendant was sitting low in his seat, his window was open, and his headlights were not turned on (although it was night). Jones, who had his right hand in his sweatshirt pocket and appeared to be holding something, exchanged words with defendant and made some gestures with his left hand as he was standing near the front of the market. According to Jones, he was trying to "calm the situation down" and signal to defendant that he should "go about [his] business." Defendant, however, continued to drive slowly in the same direction--away from the market and toward Burt's truck.

---

[2] MOB stands for "[m]oney over bitches." At trial, Jones explained that shouting, "[f]uck the MOB" on the south side of Stockton is a "crime," and that those words are "fighting words, shooting words." There was no evidence that Jones, Hunter, or Burt were in a gang. Nor was there any evidence that defendant was in a gang.

At that point, Jones approached defendant's car from behind. Jones walked quickly along the driver's side of the car and then jogged forward to the area where Burt was standing, which was near the back of Burt's truck on the driver's side. There was a sport utility vehicle (SUV) parked next to Burt's truck on the driver's side; Burt was standing next to his truck in the area between the two vehicles and Jones was a few feet in front of Burt to his right.

As defendant slowly approached Burt's truck, Jones and Burt were on the driver's side of defendant's car. Defendant briefly stopped his car about 10 feet from Jones and Burt, pointed a gun at Burt, opened fire, and then drove away. Burt immediately returned fire; shooting multiple bullets at defendant, who fired additional bullets in the direction of Burt and Jones. Hunter testified Jones and defendant were shouting at each other as defendant was driving past the market. As for the shooting, Hunter heard one gunshot, there was a short break, and then he heard more gunshots. At trial, Jones indicated that defendant stopped his car "pretty much right in front of [Burt]."

Jones called 911 after Burt collapsed near the front of the market from a gunshot wound to the chest. During the call, which was placed at 9:22 p.m., Jones indicated that there was "crossfire," and that Burt "ended up getting shot through crossfire."[3] At trial, Jones explained that his reference to "crossfire" meant that a gunshot was fired, and someone returned fire. Jones denied that he was armed with a gun on the night of the shooting and claimed that he did not know Burt was armed with a gun prior to the shooting. Jones explained that he picked Burt's gun up after the shooting for self-defense, in the event defendant returned to the market.

---

[3] A second 911 call was placed at 9:36 p.m. The caller said that she heard six to eight gunshots after she drove past a "light car with no lights on" and a group of people standing outside the market.

When deputies arrived at the market around 9:30 p.m., Burt was on the ground and unresponsive. Medical personnel arrived shortly thereafter but were unable to resuscitate Burt and he was declared dead at the scene. An autopsy revealed that Burt died as a result of a single gunshot wound to the chest. The bullet entered the right side of his chest and exited out the back of his left arm, traveling right to left in an upward trajectory. The bullet fractured two of Burt's ribs and perforated both of his lungs and his aorta, causing significant blood loss and death within minutes.

*The Police Chase*

Police officers were dispatched to the shooting at 9:25 p.m. Prior to their arrival at the scene, a police officer and his partner saw a white car make an abrupt turn and drive into oncoming traffic. The officers followed the car because they suspected the driver, later identified as defendant, was involved in the shooting. When the officers activated their emergency lights and attempted to conduct a traffic stop, defendant put his arm out the window and made an obscene gesture but did not stop. The officers activated their sirens, but defendant refused to stop. During the ensuing pursuit, which involved additional officers, defendant drove at speeds up to 80 miles per hour, ran two red lights and a stop sign, drove into oncoming traffic, and exceeded the speed limit in residential neighborhoods.

The pursuit ended on a dead-end road underneath the freeway, where defendant refused to comply with commands and was forcibly removed from his car. After a brief struggle, he was taken into custody.

*The Investigation*

Inside defendant's car, officers found an unloaded Ruger SR 80 .40-caliber semiautomatic handgun on the driver's seat, and two .40-caliber Smith & Wesson expended cartridge casings under the driver's seat. There were multiple bullet strikes on defendant's car, including two on the outside portion of the roof directly above the driver's seat, one on the dashboard, one on the front windshield on the passenger side,

5

and one on the driver's side rear passenger door. The bullet hole in the windshield was protruding outwards, indicating that the bullet went through the windshield from the interior of the car.

There were three bullet strikes on Burt's truck, one on the tailgate above and to the right of the license plate, one on the rear passenger side door, and one on the right front passenger-side fender. The rear passenger side taillight was broken, and there were red, yellow, and white pieces of reflective plastic on the ground near the truck.[4] There were no bullet strikes on the driver's side of Burt's truck or on the SUV parked on the driver's side of Burt's truck.

At the scene of the shooting, officers found one .40-caliber Smith & Wesson expended cartridge case and six .357-caliber expended cartridge casings. A prosecution expert determined that the .357-caliber expended cartridge casings were all fired by the same gun, and they were not fired from the gun found in defendant's car.[5] The expert also determined that damaged bullets found inside defendant's car were likely fired from a .357-caliber cartridge case and that damaged bullets found in Burt's truck were likely fired from a .40-caliber cartridge case.

The prosecution expert concluded that none of the bullet strikes on defendant's car were caused by a person firing from a position in front of or perpendicular to the car, but instead were fired from a position to the rear of the car. The expert also concluded that

---

[4] There was white paint on the rear bumper of Burt's truck and damage to the front of defendant's car on the driver's side. Although this evidence and the damage to Burt's taillight suggested that defendant's car hit Burt's truck as defendant was driving away, the video surveillance evidence (which we discuss in detail *post*) does not show a collision.

[5] The prosecution expert was a senior criminalist employed by the Department of Justice at the Central Valley Crime Lab. He testified as an expert in the subjects of firearms, firearm tool impressions and ammunition, and crime scene reconstruction.

6

the bullet strikes on Burt's truck were caused by a person positioned on the rear passenger side of the truck.

A defense expert agreed with the conclusions reached by the prosecution's expert regarding the firearm evidence and the bullet strikes on the vehicles, including his determination that the person who fired the .357-caliber bullets at defendant's car was positioned on the driver's side of the car "towards the rear area of the vehicle."[6] As for defendant's location during the shooting, the defense expert explained that the bullet strikes on Burt's truck (tailgate and passenger side of the truck) indicated that the bullets that caused those strikes were fired as defendant was driving away from the truck. In support of this determination, the expert noted that the bullet strikes were spread out and the impact angles of the strikes were different. The defense expert explained that Burt's truck would have provided "cover" for Burt and Jones from any bullets fired by defendant as he was driving away. He opined that Burt was shot while the right side of his body was "facing toward where the shot was coming from." He posited that "[Burt's] right arm was probably up to expose [the] area" where the bullet entered his body, and that it would not be possible for the bullet to enter Burt's body where it did if Burt had been "facing the shooter."

The gun fired by Burt that evening was never found. Jones told a detective that he threw the gun in a field after the shooting and he believed it was a Glock.

When Jones was interviewed by the police, he explained that there was an exchange of gunfire at the market between defendant and Burt, and that he believed defendant fired first, although he indicated at one point that he did not know who fired first.

---

[6] The defense expert was a senior forensic scientist employed by a private independent crime lab. He testified as an expert in the areas of firearms and crime scene reconstruction, specifically "shooting reconstruction."

During an interview with a defense investigator, Jones initially said that defendant fired the first shot, but later indicated that he did not know who fired the first shot. When the investigator asked Jones why his hand was in his pocket during the incident, Jones explained that he was playing with his cell phone. Jones told the investigator that defendant yelled "[f]uck the south" or something similar immediately prior to the exchange of gunfire.

*The Video Surveillance Evidence*

Defendant did not testify. At the close of trial, the trial court denied defense counsel's request to instruct the jury on self-defense and imperfect self-defense, finding that there was insufficient evidence to support the instructions. In closing argument, the defense theory was that defendant was "ambushed" by Burt and Jones in a planned attack and was not liable for murder because he did not possess the requisite intent (i.e., malice aforethought). In arguing that defendant was only liable for voluntary manslaughter based on provocation, defense counsel claimed that Burt fired first and defendant returned fire. Defense counsel argued that Burt fired six bullets at defendant before defendant shot and killed Burt. In support of its theory, the defense largely relied on video surveillance footage from the market. On appeal, defendant largely relies on the same evidence in arguing that reversal is required due to instructional error. Next, we describe in detail what the relevant video evidence shows.

Initially, we note the market is located on the corner of 8th Street and Beighle Street in southeast Stockton. There are parking spaces in front of the market on both streets. At trial, the jury was shown surveillance footage captured by multiple cameras at the market. Data was extracted from the footage so that the recording of the shooting could be viewed frame-by-frame. As part of the prosecution's case-in-chief, a detective offered his opinions as to what the frame-by-frame images of the shooting showed, including the muzzle flashes described *post.*

The surveillance footage, which captured video but not audio, shows Jones, Hunter, and defendant hanging out at the market for approximately 10 minutes, beginning around 9:10 p.m. Defendant is drinking what appears to be a beer and Jones is drinking out of a cup. During this time period, Jones and defendant appear to get into an argument.[7] Shortly after Jones talks to someone on his cell phone, Burt arrives.[8] Burt initially parks his truck in a well-lit area near the front of the market on Beighle Street. Hunter approaches the truck and he and Burt speak as they look toward the front of the market where defendant is standing by his car, which is parked on 8th Street. When Burt gets out of his truck, Jones and defendant appear to be talking. Jones also waives his left hand in the direction of defendant. As Jones is doing so, his right hand is in his sweatshirt pocket and he appears to be holding something. Although not entirely clear, Jones appeared to place his cell phone in his right sweatshirt pocket after the phone call.

At this point, Burt, who is looking in defendant's direction, gets back into his truck and drives it to park farther away from the market on Beighle Street in an area that is not well-lit. Meanwhile, Jones, who appears to be agitated, is yelling in the direction of defendant while his right hand remains in his sweatshirt pocket. Jones puts the hood of his sweatshirt on his head and looks in the direction of defendant.

Burt walks to the front of the market and stops near Jones and Hunter. At this point, defendant is near his car and appears to be yelling in the direction of Burt, Jones, and Hunter. The three men briefly speak and then Burt walks toward his truck as defendant backs his car up along 8th Street. Defendant then drives slowly in front of the

---

[7] Prior to this time period, defendant was hanging out inside and near the front of the market for approximately 20 minutes; he was drinking what appears to be a beer and interacting with people.

[8] Both Jones and Hunter denied calling Burt. A search of the cell phones associated with all three men did not reveal any communication between Burt and either of the other two men around the time of the shooting.

market on Beighle Street without his headlights on. His window is open and he is sitting low in his seat and making gestures with his hand.

At this point, defendant and Jones exchange words and Jones waves his left hand at defendant as defendant is driving away from the market towards Burt's truck. Immediately thereafter, Jones approaches defendant's car from behind; his right hand remains in his sweatshirt pocket. Jones walks quickly alongside defendant's car and then jogs forward to the area where Burt is standing, which is near the rear of Burt's truck on the driver's side. Jones and defendant's car arrive at Burt's location almost simultaneously. Defendant, who is driving on the wrong side of the street, is in close proximity to Jones and Burt when he briefly stops. At that moment, there appears to be a muzzle flash near the driver's side window of defendant's car.[9] Immediately thereafter, there appears to be a second muzzle flash near Burt followed by a "plume" of debris coming off the roof of defendant's car as it speeds away. There appears to be a second muzzle flash near Burt as defendant continues to drive away.

Due to poor lighting and the location of the shooting, it cannot be determined whether Burt and/or Jones are holding or displaying a gun prior to the exchange of gunfire. At trial, there was evidence that a muzzle flash would not be expected every time a gun is fired, and that the surveillance footage would not necessarily capture all muzzle flashes. There was no evidence that either Jones or defendant knew Burt was armed with a gun prior to the exchange of gunfire.

---

[9] When defense counsel objected to the detective's testimony about the muzzle flashes as speculative, the trial court instructed the jurors that they were the finders of fact and that it was up to them to determine what the video evidence showed.

## DISCUSSION

### I

### *Alleged Instructional Error*

Defendant contends the trial court committed prejudicial error by denying his request to instruct the jury on self-defense and imperfect self-defense. He argues that contrary to the trial court's determination, there was substantial evidence to support these instructions. We disagree.

A. *Applicable Legal Principles*

"For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter. [Citation.] To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082, fn. omitted; see also *People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*); *People v. Battle* (2011) 198 Cal.App.4th 50, 72.)

"[F]or either perfect or imperfect self-defense, the fear must be of *imminent* harm. 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of imminent danger to life or great bodily injury.' " (*People v. Humphrey, supra*, 13 Cal.4th at p. 1082; see also *People v. Battle, supra*, 198 Cal.App.4th at p. 72.) All the surrounding circumstances, including antecedent threats, may be considered in determining whether the defendant perceived an imminent threat of death or great bodily injury. (*Humphrey*, at p. 1083; see also *Battle*, at p. 72.)

"It is well established that imperfect self-defense is not an affirmative defense. [Citation.] It is instead a shorthand way of describing one form of voluntary manslaughter. [Citation.] Because imperfect self-defense reduces an intentional,

11

unlawful killing from murder to voluntary manslaughter by negating the element of malice, this form of voluntary manslaughter is considered a lesser and necessarily included offense of murder." (*Simon, supra*, 1 Cal.5th at p. 132.)

A trial court has an obligation to instruct the jury on all general principles of law relevant to the issues raised by the evidence, which requires instructions on lesser included offenses if there is substantial evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense, but not of the lesser. (*People v. Rogers* (2006) 39 Cal.4th 826, 866-867.) A trial court must give a requested instruction concerning a defense only if there is substantial evidence to support the defense. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1049.)

As for lesser included offenses, "[s]ubstantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed." (*Simon, supra*, 1 Cal.5th at p. 132; see also *People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8 ["Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive"].) "Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*Simon*, at p. 132; see also *Barton*, at p. 201, fn. omitted [the need to instruct on imperfect self-defense "arises only when there is substantial evidence that the defendant killed in unreasonable self-defense, not when the evidence is 'minimal and insubstantial' "].)

In the context of affirmative defenses, substantial evidence means evidence that, if believed, would be sufficient for a reasonable jury to find a reasonable doubt as to guilt. (*People v. Salas* (2006) 37 Cal.4th 967, 982-983; *People v. Oropeza* (2007) 151 Cal.App.4th 73, 78 [substantial evidence is evidence that is sufficient to deserve consideration by the jury and from which it could conclude the particular facts underlying the instruction existed].) However, a trial court "need not give instructions based solely on conjecture and speculation." (*People v. Young* (2005) 34 Cal.4th 1149, 1200; see

*Oropeza*, at p. 78 [a trial court need not "present theories the jury could not reasonably find to exist"].)

We independently determine whether the trial court erred in failing to instruct on lesser included offenses and defenses. (*Simon, supra*, 1 Cal.5th at p. 133; *People v. Waidla* (2000) 22 Cal.4th 690, 739; *People v. Oropeza, supra*, 151 Cal.App.4th at p. 78.)

B. *Analysis*

We see no instructional error. Defendant did not testify at trial and no out-of-court statement he made about the killing was admitted at trial. There was no evidence defendant ever told anyone that he shot Burt because he feared imminent harm. Although we certainly agree with defendant's point that evidence of belief in the need to defend against imminent danger to life or great bodily injury may be present without a defendant's testimony or statement to that effect (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262), here there was *no* evidence presented at trial indicating that, at the time defendant initially fired his gun, he actually believed in the need to defend himself against imminent danger to life or great bodily injury. No witness testified that defendant shot Burt out of fear or that defendant appeared fearful. No witness testified that defendant was threatened in any manner or that he knew Burt and/or Jones were armed prior to the exchange of gunfire. The video evidence does not show that Burt or Jones possessed a gun before the exchange of gunfire.

Defendant nevertheless argues the jury could have inferred that he actually believed in the need to defend himself based on the video evidence. In other words, defendant contends the video evidence constitutes substantial evidence supporting instructions on self-defense and imperfect self-defense. We are not persuaded. The video evidence encompassed the shooting as well as the events leading up to it, but did not show defendant was fearful, threatened, or aware that either Burt or Jones was armed until defendant had already fired his gun. At most, the video evidence showed a verbal dispute between defendant and Jones, which included Jones, with his right hand in his

13

sweatshirt pocket, approaching and following defendant's car on foot shortly before the shooting. Nothing in these facts, however, would permit a reasonable jury to properly infer that defendant *actually believed* he needed to shoot Burt in self-defense. Further, we are unpersuaded by defendant's contention that a reasonable jury could have concluded that he actually believed in the need to defend himself because "all of the evidence including the video" showed he fired his gun in response to being fired upon by Burt or Jones. Having reviewed the record as a whole, we see no substantial evidence supporting the conclusion that Burt fired first. The video evidence combined with the other evidence we have described in detail *ante* (e.g., firearm evidence, bullet strike evidence, medical evidence) strongly supports the conclusion that defendant shot Burt at close range from his car and Burt immediately returned fire as defendant sped off.

Finally, the available evidence as to defendant's state of mind does not provide substantial evidence of self-defense, but instead demonstrates his aggressive and provocative behavior prior to the shooting. Defendant was intoxicated, staring at people "too hard," and arguing and starting fights with people at the market. After the owner of the market told defendant and others to leave, he became agitated, made offensive remarks about the neighborhood and the gang from that neighborhood, warned everyone to get out of his way, referred to Jones and others as "bitch ass niggas," and told them to "watch."

From the relative safety of his car, defendant then drove slowly in front of the market on the wrong side of the street and made gang signs, his headlights off. He stopped his car near Burt and Jones, who were on foot, and referred to the south side with expletives before shots were fired. This evidence shows that defendant initiated the fatal interaction and strongly suggests that he shot and killed Burt as an act of aggression rather than because he believed it necessary to defend his life or to avoid great bodily injury. Indeed, defendant could have easily avoided the fatal interaction by driving away from the market in a different direction. On this record, the trial court properly refused to

14

instruct the jury on self-defense and imperfect self-defense. (See *Simon, supra*, 1 Cal.5th at p. 134 [no error in failing to instruct on self-defense or imperfect self-defense where there is no substantial evidence supporting the defendant's actual belief he was in imminent danger of great bodily injury or death].)

II

*Senate Bill No. 567*

Defendant contends, and the Attorney General concedes, that the matter must be remanded for resentencing in view of the recent changes in the law effected by Senate Bill No. 567. We agree.

At the time of sentencing, section 1170, subdivision (b) stated: "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court." (Stats. 2020, ch. 29, § 14.)

Effective January 1, 2022, Senate Bill No. 567 amended "section 1170, subdivision (b), making the middle term of imprisonment the presumptive sentence. [Citation.] A trial court may impose an upper term sentence only where there are aggravating circumstances in the crime and the defendant has either stipulated to the facts underlying those circumstances or they have been found true beyond a reasonable doubt [Citation]. In making this determination, the 'court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury.' " (*People v. Flores* (2022) 75 Cal.App.5th 495, fn. omitted.)

We agree with the parties that defendant is entitled to the ameliorative change in the law effected by Senate Bill No. 567. (*People v. Zabelle* (2022) 80 Cal.App.5th 1098.) As we next explain, we also agree with the parties that the matter must be remanded for resentencing.

15

At sentencing, the trial court imposed an upper term sentence on defendant's conviction for driving in willful or wanton disregard for the safety of persons or property while fleeing from a pursuing peace officer. (Veh. Code, § 2800.2, subd. (a).) In doing so, the court identified two aggravating circumstances, neither of which was established by stipulation, proven true beyond a reasonable doubt, or based on prior convictions evidenced by a certified record of conviction. We will vacate the sentence and remand for resentencing. (*People v. Jones* (2022) 79 Cal.App.5th 37, 44.)

III

*Remaining Issues*

Because we are remanding for resentencing based on the recent amendments to section 1170, we need not decide whether remand is warranted to allow the trial court to consider whether to strike the firearm enhancement under section 12022.53, subdivision (d) and, in its place, impose a lesser, uncharged firearm enhancement under section 12022.53, subdivision (b) or (c). (See *People v. Tirado, supra*, 12 Cal.5th at pp. 696-702 [holding that a trial court has the discretion to impose a lesser, uncharged firearm enhancement under § 12022.53].) Nor need we decide whether the trial court erred in imposing a $10,000 restitution fine without holding an ability to pay hearing (see *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1164) or whether trial counsel provided effective assistance at sentencing.

At resentencing, the trial court may reconsider all sentencing choices previously made. (*People v. Burbine* (2003) 106 Cal.App.4th 1250, 1258.) Thus, the trial court will have the opportunity to reconsider the appropriate restitution fine and whether to strike or reduce defendant's section 12022.53, subdivision (d) firearm enhancement at that time.

DISPOSITION

Defendant's sentence is vacated, and the matter is remanded for resentencing consistent with section 1170, subdivision (b) as amended as well as any other current law that applies to defendant at the time of his resentencing.

16

Following resentencing, the trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

/s/ ,
Duarte, J.

We concur:

/s/ ,
Hull, Acting P. J.

/s/ ,
Krause, J.

17